UNITED STATES of America

v.

Elvis SANTANA et al., Defendants.

Case No. 09–CB–1022(KMK).

United States District Court, S.D. New York.

Jan. 20, 2011.

Douglas B. Bloom, Esq., Nicholas L. McQuaid, Esq., United States Attorney's Office White Plains, NY, for the Government.

Thomas F.X. Dunn, Esq., New York, NY, for Defendant James McCrae.

Alexander E. Eisemann, Esq., New York, NY, for Defendant William Anderson.

Edward D. Wilford, Esq., New York, NY, for Defendant Pierre Myke.

Mark S. DeMarco, Esq., Bronx, NY, for Defendant Fred Cannon.

Prof. Douglas A. Berman, Esq., Columbus, OH, Amicus Curiae Supporting Defendants.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Defendants William Anderson, Fred Cannon, James McCrae, and Pierre Myke, joined by co-defendants, move for an order from this Court declaring that the provisions of the Fair Sentencing Act of 2010 ("FSA" or "Act") are applicable to their sentences in this case.[1] (Dkt. Nos. 257, 268, 282, 296.) For the reasons stated herein, the motions are DENIED.

### I. Background

#### A. Facts

The forty-one Defendants in this case are charged in a three-count indictment, Count One of which alleges conspiracy to distribute and possess with intent to distribute controlled substances, specifically cocaine base (in a form commonly known as crack) and powder cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). (Indictment (Dkt. No. 2)

---

1. The Court has received and granted requests to join in the pending motions from all thirty-seven Defendants in this case who have not yet been sentenced with the exceptions of Elvis Santana, Danny Bueno, Angel Delacruz, Harold Roman, Lamont Mason, Hector Barbosa, Julio Garcia, Robert Curry, Blaine Scott, Eric McKenzie, Robert Barnes, Kadema Nelson, Doniel Thomas, and Morgan Stokes. Any outstanding requests for joinder are granted.

¶¶ 3–4, 7–8.) [2] The Defendants are alleged to have been part of a drug conspiracy known as the "Santana Organization." (*Id.* ¶ 1.) The "core members" of the organization—Defendants Elvis Santana, Danny Bueno, Angel Delacruz, and Emmanuel Martinez (*id.* ¶ 2)—are alleged to have supplied narcotics to various distributors, the other Defendants in the case, (*id.* ¶¶ 2–3, 5). The alleged conspiracy existed between February and October 2009. (*Id.* ¶ 6.)

### B. Procedural History

Forty-three Defendants were indicted on October 22, 2009, and the indictment was unsealed one month later.[3] (Dkt. Nos. 2, 3.) Since then, a number of the originally indicted Defendants have pled guilty, including some of the movants here, with some of those seeking adjournment of their sentences pending the Court's determination of the pending motions.[4] Others, who have not yet pled guilty, represent that the quantity of crack distribution for which they are alleged to be responsible means that their sentence could be lower if the FSA applies to them, and are, therefore, holding off on pleading guilty. For example, counsel for Defendant James McCrae represents that the government attributes 195 grams of crack cocaine to him, and depending on whether the FSA applies to him, he would face only a five-year mandatory minimum sentence (and not ten), and the low end of his Guideline range could vary by up to twenty-three months. (Letter from Thomas F.X. Dunn to the Court (Sept. 29, 2010) ("McCrae Br.") (Dkt. No. 268) 1–2.) Defendant William Anderson is in a similar position, with his counsel representing that the highest quantity attributable to Anderson is 112 grams of a "mix" of crack and powder cocaine with crack constituting over 50 grams of that figure, and that Anderson will plead guilty if the FSA applies to him. (Decl. of Alexander E. Eisemann in Supp. of Mot. Regarding the Fair Sentencing Act of 2010 ("Eisemann Decl.") (Dkt. No. 297) ¶¶ 2, 4.) Thus, at least some of the defendants who have joined in these motions either have pled guilty and are awaiting sentence, or are holding off on a decision to plead guilty until they know what mandatory minimum sentences they face. The Court held oral argument on these motions on December 8, 2010.

### II. Discussion

The question these motions present is whether the changes in the mandatory minimum sentences for cocaine trafficking offenses made in the FSA apply to the remaining Defendants in this case, who have not yet been sentenced but who have been convicted, or accused, of conspiring to distribute cocaine base prior to the passage of the Act.

### A. The 1986 Anti–Drug Abuse Act of 1986 and the FSA

The FSA was enacted on August 3, 2010. *See* Fair Sentencing Act of 2010, Pub. L. No. 111–220, 124 Stat. 2372 (2010). Prior to the Act's passage, the sentencing provision applicable to the drug offenses alleged here, 21 U.S.C. § 841(b), equated 1 gram of crack cocaine or cocaine base with 100 grams of powder cocaine. *See* 21 U.S.C.

---

**2.** Counts Two and Three charge substantive offenses against Defendants Elvis Santana, Emmanuel Martinez, Angel Delacruz, and Danny Bueno. (Indictment ¶¶ 10–13.)

**3.** Two Defendants are fugitives. (Mem. of Law of United States of America in Opp'n to Defs.' Mot. for Appl. of the Fair Sentencing Act of 2010 (Dkt. No. 322) 2.)

**4.** To date, four Defendants have been sentenced.

§ 841(b) (2009) ("§ 841(b)"); *Kimbrough v. United States,* 552 U.S. 85, 91, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007); *United States v. Stevens,* 19 F.3d 93, 96 (2d Cir.1994). When Congress enacted this "100–to–1 ratio," in the Anti–Drug Abuse Act of 1986, Pub. L. No. 99–570, 100 Stat. 3207 (1986) ("the 1986 Act"), it "considered cocaine base to be more dangerous to society than [powder] cocaine because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence." *United States v. Buckner,* 894 F.2d 975, 978 (8th Cir.1990); *see also id.* at 978–79 & n. 9 (detailing legislative history of the 1986 Act).[5] Therefore, 21 U.S.C. § 841(b) provided for a mandatory minimum sentence of ten years for any offender convicted of a distribution-related crime involving 5 kilograms or more of powder cocaine or 50 grams or more of crack, and of five years for any offender convicted of the same involving 500 grams or more of powder cocaine and 5 grams or more of crack. 21 U.S.C. §§ 841(b)(1)(A)-(B) (2009). All but eighteen lawmakers voted in favor of this sentencing scheme in 1986. *See* Michael B. Cassidy, *Examining Crack Cocaine Sentencing in a Post–Kimbrough World,* 42 Akron L. Rev. 105, 111 (2009) ("Feeling pressure from the public to address the nation's growing drug problem, Congress passed the [1986] Act in haste."). The Sentencing Commission then incorporated the 100–to–1 ratio into the Sentencing Guidelines for all crack and powder cocaine offenses. *See id.* at 111–12.[6]

Within a few years of the 1986 Act, a chorus of critics, including practitioners, public officials (including judges), and scholars, questioned Congress's factual assumptions regarding the relative dangers

---

**5.** There has been some research arguably supporting some of Congress's concerns. *See, e.g.,* James Bopp, Jr. & Deborah Hall *Gardner, AIDS Babies, Crack Babies: Challenges to the Law,* 7 Issues L. & Med. 3, 13 (1991) (noting that while "[o]nce in the body, both crack and cocaine act the same way; ... the effects with crack may be magnified due to its higher potency"); Roland G. Fryer, Jr., et al., *Measuring the Impact of Crack Cocaine* 6–7 (Nat'l Bureau of Econ. Research, Working Paper No. 11318, 2005), *available at* http://www.nber.org/papers/w11318 (concluding that the rise in crack usage between 1984 and 1989 is correlated with negative changes in social indicators among African–Americans during that period, but that crack's adverse social effects have since dissipated).

Indeed, the Sentencing Commission has advocated, at various times over the last two decades for a 1–to–1, 5–to–1, and 20–to–1 ratio. The Commission's most recent recommendation, to lower the ratio to 20–to–1, adopted after Congress rejected the earlier, more lenient ratios, was made even in the face of empirical proof of racial disparities in crack and powder cocaine sentences, and more recent research which suggested that earlier concerns about the prenatal impact of crack as well as its impact on certain commu-

nities were overstated. *See* U.S. Sentencing Comm'n, Report to Congress: Cocaine and Federal Sentencing Policy 90–103 (2002); *see also Kimbrough,* 552 U.S. at 98, 128 S.Ct. 558 (discussing the Commission's evolving position and noting that despite the Commission's criticism of the 100–to–1 ratio from the 1986 Act, the Commission still believes that "some differential in the quantity-based penalties" for the two drugs was justified (internal quotation marks omitted)). Even the retroactive Guidelines changes adopted by the Commission in 2007, *see* U.S. Sentencing Guidelines Manual app. C, amend. 706 (Supp. 2010) (reducing by two the offense level applicable to most crack offenses), yielded sentences that were between two and five times longer for crack than for equivalent amounts of powder cocaine. *See Kimbrough,* 552 U.S. at 100, 128 S.Ct. 558.

**6.** As Justice Ginsberg noted in *Kimbrough,* until 2007, the Guidelines regime resulted in ranges that exceeded the statutory minimums created by the 1986 Act. 552 U.S. at 100 n. 10, 128 S.Ct. 558. The aforementioned 2007 changes to the Guidelines provided for base offense levels the corresponding ranges for which included, and therefore fell below, the statutory mandatory minimums from the 1986 Act. *Id.*

of crack and powder cocaine and the extent to which trafficking in each drug is associated with violence. *See, e.g., id.* at 132–33 (noting that studies dating back to the 1990s challenged the factual premises of the 1986 Act); William W. Schwarzer, *Sentencing Guidelines and Mandatory Minimums: Mixing Apples and Oranges,* 66 S. Cal. L. Rev. 405, 409 (1992) (noting the view that there was inadequate evidence to substantiate the belief that crack was substantially more dangerous than powder cocaine). These authorities also have contended, as far back as the early 1990s, that the 100–to–1 ratio produced significant racial disparities in sentencing, as the vast majority of crack defendants subject to the mandatory minimums for offenses involving small quantities of the drug are and have been African–American. *See, e.g., Kimbrough,* 552 U.S. at 97–99, 128 S.Ct. 558 (describing reports of the United States Sentencing Commission calling into question the 100–to–1 ratio based on its disparate impact on minorities); Gerald W. Heaney, *The Reality of Guidelines Sentencing; No End to Disparity,* 28 Am. Crim. L. Rev. 161, 205–06 (1991) (noting data suggesting that one reason for disproportionately higher sentences for African–American offenders was the 100–to–1 ratio between crack and powder cocaine); David A. Sklansky, *Cocaine, Race, and Equal Protection,* 47 Stan. L. Rev. 1283, 1285–1302 (1995) (arguing that the 1986 Act discriminates against African Americans); *see also* Lynette Clemetson, *Judges Look to New Congress for Changes in Mandatory Sentencing Laws,* N.Y. Times, Jan. 9, 2007, at A12 ("At a sentencing commission hearing in November, Judge Walton, associate director of the White House Office of National Drug Control Policy under the first President George

Bush and a onetime supporter of tough crack cocaine sentences, said it would be 'unconscionable [because of the resulting disparate impact on minority offenders] to maintain the current sentencing structure' on crack cocaine."). *But see* Randall Kennedy, *The State, Criminal Law, and Racial Discrimination: A Comment,* 107 Harv. L. Rev. 1255, 1268–69 (1994) (criticizing equal protection objections to crack-cocaine sentencing ratios, in part on the argument that "[i]f it is true that blacks as a class are disproportionately victimized by the conduct punished by [such statutes], then it follows that blacks as a class may be helped by measures reasonably thought to discourage such conduct"). The Fair Sentencing Act represents Congress's response to these concerns. *See* 156 Cong. Rec. S1680–81 (daily ed. Mar. 17, 2010) (statement of Sen. Richard Durbin) ("We have talked about the need to address the crack-powder disparity for too long. Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust").

The FSA's stated purpose is to "restore fairness to Federal cocaine sentencing." FSA pmbl. It attempts to effect this purpose by taking three actions relevant here. First and most importantly, section 2 of the Act raises the quantity of crack triggering the five- and ten-year mandatory minimum sentences from 5 to 28 grams for a mandatory five-year sentence and from 50 to 280 grams for a mandatory ten-year sentence. FSA § 2(a) (codified at 21 U.S.C. §§ 841(b)(1)(A)(ii)—(iii), (B)(ii)—(iii)). This change has the effect of replacing the 100–to–1 ratio with an 18–to–1 ratio in sentencing treatment of offenses involving equivalent amounts of crack and powder cocaine.[7] Second, section 3 elimi-

7. According to media reports, Congress settled on the 18–to–1 ratio after an encounter in

the Senate's gym. *See* Carrie Johnson, *Senate Bill Would Reduce Sentencing Disparities in*

nates entirely the mandatory minimum sentence that previously had been applicable to simple possession of crack. *Id.* § 3 (codified at 21 U.S.C. § 844(a)). Third, the Act directs the Sentencing Commission to promulgate "such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law" within ninety days of the Act's enactment, *Id.* § 8. The Act makes a number of other changes to federal cocaine sentencing, including increases to fines for trafficking offenses, *id.* § 4, and directives to the Sentencing Commission to promulgate Guideline amendments providing for sentencing enhancements based on various aspects of an individual defendant's conduct, *id.* §§ 5–6. The Act again grants the Commission "Emergency Authority" to implement these directives within ninety days. *Id.* § 8. The Commission has since exercised this authority, issuing a temporary amendment to §§ 2D2.1 and 2D2.2 of the Guidelines to reflect the FSA's requirements effective November 1, 2010. *See* Notice of a Temporary, Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66,188, 66,188 (Oct. 27, 2010).[8]

## B. Ripeness

Prior to oral argument, the Court raised the issue whether the questions presented by these motions are ripe for adjudication.

---

*Crack, Powder Cocaine Sentencing*, Wash. Post, Mar. 14, 2010, at A1 (noting that the 18-to-1 ratio came about when "Sen. Majority Whip Richard J. Durbin (D–Ill.) encountered colleagues Jeff Sessions (R–Ala.) and Orrin G. Hatch (R–Utah) in the Senate gym early Thursday, before they had started their workouts").

Some of the critics of the 1986 Act were displeased that the FSA did not eliminate the entire disparity between crack and powder cocaine. For example, one practitioner argued:

The Senate Judiciary Committee's vote to "reduce" the crack cocaine/powder cocaine punishment disparity from 100:1 to 20:1 is a scandalous, racist, and politically motivated act. In view of the near-unanimous consensus that there is no justifiable basis for punishing crack cocaine more harshly than powder cocaine, and that the 100:1 ratio was both arbitrary and irrational—even DOJ called for elimination of the disparity—the Senate Judiciary Committee settles on an equally unsupportable, irrational, and arbitrary punishment scheme, one that will disproportionately affect minorities, destroy families, and promote disrespect for the law.

Douglas Berman, *Varied Reactions to the Crack/Powder Reform Work of the Senate Judiciary Committee*, Sentencing Law and Policy (Mar. 11, 2010, 6:18 PM), http://sentencing.typepad.com/sentencing_law_and_policy/2010/03/very-different-reactions-to-the-

crackpowder-reform-work-of-the-senate-judiciary-committee.html (quoting an email from Gary G. Becker, Esq.). Indeed, the Justice Department advocated for a 1–to–1 ratio. *See Restoring Fairness to Federal Sentencing: Addressing the Crack–Powder Disparity: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 100 (2009) (hereinafter "2009 Senate Hearing") (statement of Lanny A. Breuer, Assistant Att'y Gen., Criminal Div., U.S. Dep't of Justice) ("The Administration believes Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine.").

8. These new Guidelines therefore will presumably apply to any sentences imposed in this case. *See* 18 U.S.C. § 3553(a)(4)(ii) (providing that the applicable Guidelines are those "in effect on the date the defendant is sentenced"). Because the new Guidelines unrelated to the quantity of crack consist mostly of enhancements, however, there is a possibility that application of the new Guidelines might result in a harsher penalty than a defendant would have received prior to the emergency enactment—presenting a potential *ex post facto* problem. *See United States v. Ortiz*, 621 F.3d 82, 87 (2d Cir.2010) (holding that applying a post-conduct Guidelines enhancement that presents a "substantial risk" of a higher sentence could violate the *ex post facto* clause).

Both sides at oral argument agreed that the motions are ripe for decision at least with respect to some Defendants.

 Ripeness is a justiciability doctrine the purpose of which is to "prevent[ ] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Ross v. Bank of Am., N.A. (USA),* 524 F.3d 217, 226 (2d Cir.2008) (internal quotation marks omitted); *see also Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 807–08, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). Ripeness has both "constitutional" and "prudential" components. *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* — U.S. —, 130 S.Ct. 1758, 1767 n. 2, 176 L.Ed.2d 605 (2010); *N.Y. Civil Liberties Union v. Grandeau,* 528 F.3d 122, 130–31 (2d Cir. 2008). Ripeness may be raised on the Court's own motion, *see United States v. Fell,* 360 F.3d 135, 139 (2d Cir.2004), and the Court is not bound by the positions of the parties on the issue. *See Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993).[9]

 Constitutional ripeness is concerned with "Article III limitations on judicial power." *Stolt–Nielsen,* 130 S.Ct. at 1767 n. 2 (internal quotation marks omitted); *see also Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). "[Constitutional ripeness] prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules

unless the resolution of an actual dispute requires it." *Simmonds v. INS,* 326 F.3d 351, 357 (2d Cir.2003). The inquiry essentially mirrors that governing Article III standing, and asks whether the question presents a "genuine 'case or controversy.' " *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 733 n. 7, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). A genuine case or controversy exists if a plaintiff shows "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *Horne v. Flores,* — U.S. —, 129 S.Ct. 2579, 2592, 174 L.Ed.2d 406 (2009). Significantly for these motions, a claim is not ripe under this analysis "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (internal quotation marks omitted).

 Prudential ripeness is "a tool" that courts use "to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of ... issues that time may make easier or less controversial." *Simmonds,* 326 F.3d at 357. "In evaluating a claim to determine whether it is ripe for judicial review, [the courts] consider both 'the fitness of the issues for judicial decision' and 'the hardship of withholding court consideration.' " *Stolt–Nielsen,* 130 S.Ct. at 1767 n. 2 (quoting *Catholic Soc. Servs.,* 509 U.S. at 57 n. 18, 113 S.Ct. 2485); *see also Simmonds,* 326 F.3d at 359.[10] An issue is "fit" for decision if its

9. The Government has not chosen to contest the ripeness of the motions here. While this might waive any concerns *about prudential* ripeness, *see Stolt–Nielsen,* 130 S.Ct. at 1767 n. 2, the Government may not concede constitutional ripeness.

10. The Court notes that while the Second Circuit has, in *Simmonds,* separated the two strands of ripeness doctrine and articulated differing tests to apply to them, courts generally appear to use the two-part "fitness" and "hardship" test for evaluating ripeness generally, without regard to whether the ripeness

effects are "sufficiently direct and immediate," *Abbott Labs. v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), such that the question would not "benefit from further factual development of the issues presented," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (internal quotation marks omitted). Purely legal issues fall into this category, *see id.*, but if further facts could develop that would narrow their scope, even pure legal questions might not be "fit" for decision, *see Nat'l Park Hospitality Ass'n*, 538 U.S. at 812, 123 S.Ct. 2026. The "hardship" requirement asks whether a party will suffer some present harm if the court postpones the decision of a given question. *See Simmonds*, 326 F.3d at 360; *see also United States v. Johnson*, 446 F.3d 272, 278 (2d Cir.2006) ("The mere possibility of future injury, unless it is the cause of *some present detriment*, does not constitute the requisite hardship." (internal quotation marks and alteration omitted) (emphasis in original)).

 While most of the remaining Defendants have made or joined the motions, their cases are at different stages depending on whether they have entered pleas of guilty or not guilty. Moreover, different amounts of crack and powder cocaine are attributed to each Defendant, potentially affecting the FSA's applicability to their cases. A Defendant who is convicted, either at trial or via a plea, of an offense involving only powder cocaine or involving certain quantities of crack cocaine unaffected by the changed mandatory minimum thresholds will not be affected by the applicability of the FSA's new mandatory minimums to this case.[11] Such Defendants lack standing to seek a declaration that it does apply, as they will suffer no injury from application of the pre-FSA statutory scheme. *See Horne*, 129 S.Ct. at 2592.[12] Whether the Act applies to this case only makes a difference—at least with respect to the applicable mandatory minimum sentence—for those Defendants who have pled to, or stand accused of, offenses involving crack cocaine in amounts between 5 grams and 28 grams, and 50 grams and 280 grams. Defendants whose offenses fall into the former category will be subject to a five-year mandatory minimum only if the FSA is inapplicable, and Defendants whose offenses place them in the latter category will be subject to mandatory minimum of five years (rather than ten) if the Act applies. *See* FSA § 2(a).

For such Defendants who have pled guilty and are awaiting sentencing, ripeness (and standing) will depend on the amount of crack to which they have admitted to distributing or conspiring to distrib-

---

concern is technically of constitutional or prudential dimension. *See, e.g., Stolt–Nielsen*, 130 S.Ct. at 1767 n. 2; *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807–08, 123 S.Ct. 2026; *Texas v. United States*, 523 U.S. at 300–01, 118 S.Ct. 1257; *Connecticut v. Duncan*, 612 F.3d 107, 112–13 (2d Cir.2010).

**11.** For example, a Defendant convicted of an offense involving between 28 and 49 grams of crack is unaffected by the FSA's changed mandatory penalties, because under both the FSA and the 1986 Act such a Defendant is subject to a five-year mandatory minimum. Similarly, Defendants convicted of offenses

involving greater than 280 grams of crack are subject to a mandatory ten-year penalty whether under the FSA or the 1986 Act, and Defendants convicted of offenses involving under 5 grams are not, under the FSA and the 1986 Act, subject to any mandatory minimum penalty at all.

**12.** This is not to say that these Defendants would lack standing to litigate issues related to the Guidelines applicable to their sentences, but any such issues are not before the Court at this time.

ute. Among those Defendants who have joined in the motions, the motion is therefore ripe with respect to Defendants Emmanuel Martinez and Andre Rodriguez, who have admitted to offenses involving at least 50 grams of crack, and Omari Nelson, who has admitted to an offense involving a quantity of crack that could place him below the FSA's new mandatory minimum thresholds. The sentences of these Defendants will be affected by whether the FSA applies in this case; indeed, Martinez and Nelson have requested that the Court postpone their sentences until the Court determines the applicability of the FSA to them. (Letter from Nicholas L. McQuaid, Ass't U.S. Att'y, to the Court (Nov. 12, 2010) (Dkt. No. 328); Letter from John M. Rodriguez to the Court (Dec. 30, 2010) (Dkt. No. 379).) It is true that the Government attributes drug quantities to some Defendants far in excess of the amounts that would trigger the FSA's mandatory minimum thresholds, and the precise quantity for which each Defendant is responsible will be determined in some cases at a sentencing hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978). But this Court could still depart from any Guidelines sentence suggested by a drug quantity higher than that to which the Defendants admitted in their pleas, and could do so below the 1986 Act's mandatory minimums *if* the FSA applies to these Defendants. Thus, the motion is ripe with respect to the above-listed Defendants.[13]

For those Defendants who have *not* yet been convicted of any offense, whether their sentences will ultimately be affected by the applicability of the FSA depends on a number of "contingent future events" that might not occur. *Texas v. United States*, 523 U.S. at 300, 118 S.Ct. 1257. A Defendant in this position might be acquitted, or might be convicted of an offense placing him outside of the categories of Defendants affected by these motions—Defendants convicted of offenses involving 5 to 28 grams or 50 to 280 grams of crack. That a defendant may be acquitted of a charge does not necessarily make pre-trial challenges to criminal statutes unripe. *See, e.g., United States v. Quinones*, 313 F.3d 49, 59–60 (2d Cir.2002) (noting that the Second Circuit has considered legal challenges to criminal statutes raised and decided by the district courts pre-trial, even though the defendants might never have been convicted); *United States v. Cortes*, 697 F.Supp. 1305, 1307–08 (S.D.N.Y.1988) (constitutional challenge to Sentencing Guidelines was ripe prior to trial for defendants who had pled not guilty). But this case does not involve defendants raising facial constitutional challenges to federal criminal statutes. Instead, some Defendants here seek to challenge a particular sentence that might be imposed *if* they are convicted of certain offenses involving certain quantities of crack. To decide such a question based on uncertain facts would be to issue an advisory opinion on a *possible* sentence a Defendant could face *if* certain facts are established. *See, e.g., United States v.*

---

13. A number of other Defendants who have pled guilty are similarly situated to Martinez, Rodriguez, and Nelson, but they have not formally made or joined the motions. Other Defendants, although perhaps lacking standing themselves to make or join these motions, have requested to adjourn their sentences until after the Court decides the motions, in part on the ground that their sentences may be affected by the Court's outcome. Specifically, they note that 18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities" among similarly situated defendants. (Letter from Larry Sheehan to the Court (Dec. 10, 2010) (Dkt. No. 375); Letter from Alan Nelson to the Court (Dec. 21, 2010) (Dkt. No. 376).) The Court has granted such requests.

*Ware,* 709 F.Supp. 1062, 1063 (N.D.Ala. 1989) (refusing to decide prior to trial whether a particular provision of the Sentencing Guidelines would apply to the conduct of which defendant was accused); *see also Cheffer v. Reno,* 55 F.3d 1517, 1523 (11th Cir.1995) (holding that Eighth Amendment challenges to sentences that could be imposed under certain statutes are not ripe until "the actual, or immediately pending, imposition of the challenged form of punishment"). In other words, a live controversy does not yet exist (and the issue is not yet "fit" for judicial decision) over the applicability of the FSA to Defendants who have not already pled guilty unless and until sufficient facts are developed or stipulated that resolve whether or not a particular Defendant will be affected by the Court's ruling.

Defendants Anderson, McCrae, Donald Taylor, and Jessie Fonseca each represent that the drug quantities attributed to them mean the FSA's applicability will affect their potential sentences. McCrae represents that the Government attributes 195 grams of crack cocaine to him (McCrae disputes that figure), and that he would not qualify for the safety valve provision of 18 U.S.C. § 3553(f). (McCrae Br. 1.) If the Government proves its case against McCrae, therefore, his offense will fall squarely within the category affected by the FSA's changed mandatory minimum sentences; McCrae would be subject to a mandatory ten-year sentence under the 1986 Act, but only a mandatory five-year sentence under the FSA. Similarly, Anderson represents that the "highest drug weight" attributable to him is a mix of 112 grams of crack and powder cocaine, with over 50 grams consisting of crack. (Eisemann Decl. ¶ 2.) Taylor represents that the Government attributes 52 grams of crack to him. (Letter from Martin J. Siegel to the Court (Sept. 27, 2010) (Dkt. No. 272).) Finally, Fonseca represents that "his relevant conduct is less than 28 grams of cocaine base," and therefore that under the FSA he would not be subject to any mandatory minimum penalty. (Letter from Marilyn S. Reader to the Court (Sept. 23, 2010) (Dkt. No. 262).) [14]

As to hardship, these Defendants face the choice whether to plead guilty instead of going to trial. Courts are split on the question whether uncertainty as to a plea constitutes sufficient "hardship" to make a given issue ripe. There is certainly a viable argument that a question of law relating to a defendant's potential mandatory minimum sentence must be resolved prior to trial in the case of a Defendant considering a guilty plea, both because Federal Rule of Criminal Procedure 11 requires the Court to advise the defendant before accepting a plea of "any mandatory minimum penalty," Fed.R.Crim.P. 11(b)(1)(I), and because of the requirement that a plea is only valid if knowingly and intelligently made. *See United States v. Sanders,* No. 88–CR–141, 1988 WL 107377, at *1 (N.D.Ill. Oct. 4, 1988) (question whether defendant's prior attempted burglary was a "violent felony" under 18 U.S.C. § 924(e)(1), the application of which would trigger mandatory minimum sentence, was ripe for decision prior to trial); *cf. Cortes,* 697 F.Supp. at 1307–08 ("hardship" requirement for ripeness was established be-

14. For the remaining Defendants awaiting trial, the Court has no similar information in the record akin to the representations of Anderson, McCrae, Taylor, or Fonseca regarding the drug quantities attributable to them; the motions are therefore unripe as to the remaining Defendants, as the Court lacks any indication that these Defendants will suffer injury absent a decision by this Court at this juncture, *see Simmonds,* 326 F.3d at 357, 360, or that any live controversy over the applicability of the FSA will arise in the future, *see Texas v. United States,* 523 U.S. at 300, 118 S.Ct. 1257.

cause delaying a decision on constitutionality of Sentencing Guidelines would deprive the defendant of the ability to make an intelligent decision regarding whether to plead guilty). *But see United States v. Bogle,* 689 F.Supp. 1121, 1127–28 (S.D.Fla. 1988) (constitutional challenge to Guidelines ripe only with respect to those defendants who had pled guilty, not those not yet convicted; "[i]nsofar as the defendant faces a hardship from deferring a decision [whether to plead guilty] until the dispute has become concrete, that dilemma is no different from any other legal issue as to which a defendant might [desire] but is not entitled in advance to a judicial determination," *id.* at 1128).[15]

The Court need not resolve this question in this case, however, because Defendant Anderson has, through counsel, represented that he *will* plead guilty if the Court declares the FSA applicable in his case. (Eisemann Decl. ¶ 4; Dec. 8, 2010 Oral Argument Tr. 53.) Anderson is, therefore, in essentially the same position as the Defendants who have pled guilty and who await sentencing. The question is fit for adjudication because no contingencies exist (other than the possibility of acquittal if he chose to go to trial) that would render a decision as to the FSA's applicability to him advisory, and no further facts will be established by delay in the Court's decision.

The motions are ripe with respect to Martinez, Rodriguez, Omari Nelson, and Anderson. The Court will therefore decide the merits of the motions "limited to [the] facts" relevant to these Defendants. *United Pub. Workers of Am. (C.I.O.) v.*

*Mitchell,* 330 U.S. 75, 91–92, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (in constitutional challenge to Hatch Act and civil service rules promulgated thereunder, only one federal employee's affidavit alleged sufficient facts for the Court to conclude that enforcement of the act as to him would be likelier than purely speculative; Court decided merits of only his claim). In this case, however, because no *material* facts differ among all Defendants—each is alleged to have committed his crime at the same time, and each has yet to be sentenced—the upshot will be that the Court's decision with respect to the above-listed Defendants will apply fully to any other Defendants in this case for whom the issue might become ripe in the future. And, because all moving Defendants have adopted the arguments raised in the memoranda submitted by Defendants Anderson, Cannon, McCrae, and Myke, the Court will address these arguments in this Opinion.

## C. The Abatement Doctrine and the Federal Saving Statute

"At common law, the repeal of a criminal statute abated all prosecutions which had not reached final disposition in the highest court authorized to review them. Abatement by repeal included a statute's repeal and re-enactment with different penalties. And the rule applied even when the penalty was reduced." *Bradley v. United States,* 410 U.S. 605, 607–08, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973) (citations omitted). The abatement doctrine, as true of many common law doctrines, had its roots in English law. *See* Comment, *Today's Law*

---

**15.** As Defendants pointed out at oral argument, they might face other hardships as well were the Court to defer decision. Uncertainty as to the applicable mandatory minimum sentence might affect a Defendant's trial strategy (i.e., a Defendant might attempt to avoid conviction only on crack-related offenses if the FSA applies) and the advice given by defense counsel as to the consequences of a potential guilty plea. The Court expresses no view on whether these would constitute sufficient "hardship" to satisfy the ripeness requirements.

*and Yesterday's Crime: Retroactive Application of Ameliorative Criminal Legislation*, 121 U. Pa. L. Rev. 120, 121–24 (1972) (hereinafter "Comment, *Today's Law* ").[16] However, its application in American law proved particularly problematic because of "the interplay of the Constitution's *ex post facto* clauses." *Id.* at 124. If legislation amended, repealed, or re-enacted previous legislation without a savings clause, conviction under the old statute was prohibited under the abatement doctrine, while conviction under the new statute, if it increased punishment, was barred by the *ex post facto* clauses. *See id.* at 124–25; John P. MacKenzie, Comment, *Hamm v. City of Rock Hill and the Federal Savings Statute*, 54 Geo. L.J. 173 (1965) (noting that the abatement doctrine "has often provided an escape hatch for an accused fortunate enough to have his offense made the subject of stiffer penalties.").

The legislative reaction to this doctrine, from both the states and federal government, was the enactment of general savings legislation that would apply, in varying ways, to laws that repealed, amended, or re-enacted previous legislation, the result of which was to shift the presumption towards non-abatement in the absence of contrary legislative intention. *See* Comment, *Today's Law, supra*, at 127. For example, most states adopted general savings statutes (many applying to civil and criminal enactments), *see id.* at 127–28, while a handful have incorporated savings provisions in their constitutions, *see id.; see also* Fla. Const. art. 10, § 9; N.M. Const. art. 4, § 33; Okla. Const. art. 5, § 54. Most of these statutory fixes provide that a "legislative change in a statute

---

**16.** "The earliest statements of the common-law doctrine of abatement are attributed to the seventeenth-century jurist Matthew Hale and the eighteenth-century-sergeant-at-law William Hawkins." S. David Mitchell, *In with the New, Out with the Old: Expanding The Scope of Retroactive Amelioration*, 37 Am. J. Crim. L. 1, 6 n. 29 (2009). According to Hale:

> [W]hen an offense is made treason or felony by an act of parliament, and then those acts are repealed, the offenses committed before such repeal, and the proceedings thereupon are discharged by such repeal, and cannot be proceeded upon after such a repeal, unless a special clause in the act of repeal be made enabling such proceeding after the repeal, for offenses committed before the repeal.

1 Matthew Hale, Historia Placitorum Coronae: The History of the Pleas of the Crown 291 (George Wilson ed. 1778).

The doctrine is not without its critics. According to one commentator, "[a] careful reading of all the cases ... does not reveal any adequate reason why the law should be as it is or should so remain.... [T]he existing rule is based upon the continued, thoughtless acceptance of an unsupported statement by Hale." Albert Levitt, *Repeal of Penal Statutes and Effect on Pending Prosecutions*, 9 A.B.A. J. 715, 715 (1923); *see also* Mitchell, *supra*, at 26 ("Jurists and scholars alike ... have criticized the doctrine for being flawed and unsupported from its inception."); Note, *Effect of Repeal of a Criminal Statute Upon Prosecutions For Prior Acts*, 24 Iowa L. Rev. 744 (1939) (noting that "[n]o reasons were given [by Hale] for the rule and no authorities were cited"). *But see Hamm v. City of Rock Hill*, 379 U.S. 306, 322, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) (Harlan, J., dissenting) ("The common-law rule of abatement is basically a canon of construction conceived by the courts as a yardstick for determining whether a legislature, which has enacted a statute making conduct noncriminal which was proscribed by an earlier criminal statute, also intended to put an end to nonfinal convictions under the former legislation. In effect, the doctrine of abatement establishes a presumption that such was the purpose of the legislature in the absence of a demonstrated contrary intent...."); Comment, *Today's Law, supra*, at 122 n. 16 ("This presumption of legislative intent is logical and reasonable because the very act of unqualified repeal imputes to the legislature a determination that the former legislation was no longer socially necessary or desirable.").

will not extinguish penalties, rights, or liabilities accrued or incurred under the original law." Comment, *Today's Law, supra*, at 128 (canvassing state laws).

However, under some state savings statutes, while new legislation does not abate a prosecution itself, a reduction in punishment may apply to those whose conduct pre-dates the new law but who have yet to be sentenced. *See, e.g.*, Ohio Rev.Code Ann. § 1.58(B) (West 2010) (providing that if any penalty "is reduced" by new legislation, the new law shall apply if sentence has not been imposed); Vt. Stat. Ann. tit. 1, § 214(c) (West 2010) ("If the penalty or punishment for any offense is reduced by the amendment of an act or statutory provision, the same shall be imposed in accordance with the act or provision as amended unless imposed prior to the date of the amendment."); Va.Code Ann. § 1–239 (West 2010) (providing that a new law mitigating punishment may, "with the consent of the party affected, be applied to any judgment pronounced after the new [law] takes effect"); *Ferdinand v. Dormire*, 212 F.3d 473, 476 (8th Cir.2000) (holding that habeas petitioner was entitled to benefit from post-offense reduction in punishment under then-existing version of Missouri's savings statute only up until judgment); *State v. Flagg*, 160 Vt. 141, 624 A.2d 864, 865 (1993) (holding that Vermont's savings provision required application of reduced penalty as provided by new version of law when new law pre-dated offender's sentence); *People v. Denier*, 76 Ill.App.3d 214, 31 Ill.Dec. 755, 394 N.E.2d 1073, 1075 (1979) (noting that Illinois' savings statute operated to allow yet-to-be-sentenced defendants who consent to being sentenced under new law); *Jones v. Commonwealth*, 104 Ky. 468, 47 S.W. 328 (K.y.Ct.App.1898) (same application of Kentucky's savings statute).

Congress took its own path to override the common law abatement rule in 1871 by enacting the so-called "general saving statute." *See* Act of Feb. 25, 1871, ch. 71, § 4, 16 Stat. 431, 432 (codified as amended at 1 U.S.C. § 109); *see also Warden v. Marrero*, 417 U.S. 653, 660, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). The current version of this statute provides in relevant part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109 (hereinafter " § 109" or "Saving Statute"). In *United States v. Reisinger*, 128 U.S. 398, 9 S.Ct. 99, 32 L.Ed. 480 (1888), the Supreme Court held that the words "penalty," "forfeiture," and "liability" in the Saving Statute applied both to criminal offenses and the punishment for violations of those offenses. *See also United States v. Smith*, 354 F.3d 171, 175 (2d Cir.2003) (noting that "sentencing is an integral part of the 'prosecution' of the accused, as that term is used in § 109, and therefore that § 109 saves sentencing provisions in addition to substantive laws"); *Lovely v. United States*, 175 F.2d 312, 317 (4th Cir.1949) (noting that "punishment" is synonymous with "penalty," and that "liability" and "forfeiture" are synonymous with "punishment").[17] Thus, where § 109 applies, changes in the criminal law not only save prosecutions initiated pursuant to the prior criminal prohibition,

---

17. The Saving Statute also has been held to apply to statutory amendments, in addition to the "repeal of any statute." *See United States v. Mechem*, 509 F.2d 1193, 1194 n. 3 (10th Cir.1975).

but also any sentence that could be imposed under the old law.

However, as is clear from its plain language, and unlike some of the aforementioned state statutes, § 109 contains no provision exempting new statutes reducing punishment from its reach. Not surprisingly, then, the overwhelming consensus among the courts has been that, if it applies, § 109 bars "application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense." *Marrero,* 417 U.S. at 661, 94 S.Ct. 2532; *see also United States v. Klump,* 536 F.3d 113, 120 (2d Cir.2008) (holding that defendant was properly sentenced to ten-year mandatory minimum under old law, and not the five-year minimum under the new law, even though the old law "had expired before [defendant] was sentenced"); *Jones v. United States,* 327 F.2d 867, 870 (D.C.Cir. 1963) (holding that the new statute allowing for life imprisonment, in lieu of capital punishment, did not apply to defendant awaiting execution, in part applying § 109 and noting that the new law "contained no language applying its ameliorating provisions to previously committed offenses"); *United States v. Kirby,* 176 F.2d 101, 104 (2d Cir.1949) (affirming district court's sentence post-dating ameliorative statute for conduct committed while old law was in effect); *Maceo v. United States,* 46 F.2d 788, 789 (5th Cir.1931) (holding that offender who committed crime before Congress reduced maximum sentence for sale of liquor received no benefit under predecessor to § 109). As the Fourth Circuit has observed, in describing the difference between the federal Saving Statute and some of its state counterparts:

> Our attention is called to statements and cases setting out such broad principles as the court should sentence in accord with the law in existence at the time of sentence, or where a later statute miti-gates punishment for an offense, the accused may elect whether he is to be sentenced under the old or the new statute. These are of little help in the instant case for here we are dealing, not with broad general principles but with the interpretation of definite words in a specific federal statute.

*Lovely,* 175 F.2d at 317 (citations omitted).

In other words, under § 109, there is no basis to parse application of a new statute retroactively, that is, to individuals already sentenced under the old law, as distinct from applying it retrospectively, that is, to individuals yet to be sentenced as of the enactment of the new law but whose criminal conduct pre-dates the new law. Instead, under the plain language of § 109, unless Congress expressly provides otherwise in the new law, the Saving Statute means that an offender whose conduct pre-dates the new law is to be prosecuted *and* sentenced under the old law. *See Smith,* 354 F.3d at 173 (noting that "relevant Supreme Court and Second Circuit case law supports the Government's contention that it is the law at the time of the offense ... that governs").

Any doubt on this question was resolved nearly four decades ago when the courts applied the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("the 1970 Act"), which, among other things, eliminated a mandatory five-year minimum for certain narcotics offenses. In *United States v. Stephens,* 449 F.2d 103 (9th Cir. 1971), the Government sought a writ of mandamus where a district judge imposed a five-year sentence (as required by the pre–1970 Act law), but then suspended the sentence in light of the recently enacted 1970 Act. In denying the writ, the Ninth Circuit held that the prosecution ended with the judgment of conviction, which was valid under the old law, but that "[w]hat

occurs thereafter—the manner in which judgment is carried out, executed or satisfied, and whether or not it is suspended—in no way affects prosecution of the case." 449 F.2d at 105. Indeed, according to the *Stephens* court, a suspended sentence "reflect[ed] the current view that probation should be available for these offenses," and "[a]llowing it here permits a salutary tempering of the arbitrariness which otherwise would result from hewing to a cut-off date in transition from old to new law and an approach to evenhanded dispensation of justice not otherwise available." *Id.* at 106. The Ninth Circuit therefore concluded that it "fail[ed] to see how the public interest would be served by straining for a statutory construction that would achieve a contrary result." *Id.*

*Stephens* met a chilly response out East. In *United States v. Ross,* 464 F.2d 376 (2d Cir.1972), for example, the Second Circuit held that in previous decisions it had "specifically rejected" the notion that the 1970 Act applied to defendants not yet sentenced for conduct that pre-dated its enactment. 464 F.2d at 378–79 (citing *United States v. Singleton,* 460 F.2d 1148, 1155 (2d Cir.1972) and *United States v. Fiotto,* 454 F.2d 252, 254–55 (2d Cir.1972)). In particular, the Second Circuit noted that "[w]hile it may plausibly be argued that § 109 refers only to persons already sentenced, the contrary construction seems to us more reasonable." *Id.* at 379. Instead, the Second Circuit maintained its long-held view that if § 109 applies, an individual is to be sentenced under the law in place at the time of the offense conduct. *See id.* at 380 (citing *United States v. Taylor,* 123 F.Supp. 920 (S.D.N.Y.1954), *aff'd,* 227 F.2d 958 (2d Cir.1955)). A similar sentiment

was expressed by the First Circuit in *United States v. Bradley,* 455 F.2d 1181 (1st Cir.1972), in which the court rejected the defendants' claim, itself based on *Stephens,* that "since the 1970 Act was in force when they were sentenced, the court should not have felt constrained by" the old law.[18] 455 F.2d at 1190. And, most tellingly, the split among these circuits was resolved in *Bradley v. United States,* 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973), in which the Supreme Court sided with the First and Second Circuits. In so doing, Justice Marshall expressly concluded, relying in part on § 109, that the "mandatory minimum sentence of five years must ... be imposed on offenders who violated the law before [the 1970 Act was enacted]." 410 U.S. at 611, 93 S.Ct. 1151.

The import of § 109 is that, unless the repealing statute "expressly provide[s]" otherwise, a defendant may, pursuant to a statute that has been repealed, be prosecuted and, if convicted, sentenced for any offenses committed prior to the effective date of the repealing act. To be sure, in determining whether a new statute is to apply retroactively, the courts are not to substitute the Saving Statute for the clear intent of Congress to retroactively apply subsequent legislation. Congress could "expressly provide" that a new law should apply to defendants accused of committing pre-enactment offenses, or certain categories thereof (such as those who have yet to be sentenced). But, the Supreme Court long ago emphasized that the Saving Statute is "to be treated as if incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that

---

**18.** Both courts also rejected the portion of *Stephens* which held that § 109 was inapplicable to the repeal of the old sentencing law, as § 109 was intended merely to obviate

"mere technical abatement," *Stephens,* 449 F.2d at 105. *See Ross,* 464 F.2d at 379; *Bradley,* 455 F.2d at 1191.

effect be given to all the parts of a law, the section must be enforced *unless, either by express declaration or necessary implication,* arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect to [the Saving Statute]." *Great N. Ry. Co. v. United States,* 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908) (emphasis added); *see also Hertz v. Woodman,* 218 U.S. 205, 218, 30 S.Ct. 621, 54 L.Ed. 1001 (1910) ("[W]e must take that general saving clause into consideration as a part of the legislation involved in the determination of whether a 'liability' had been incurred by the imposition of a tax prior to the act that destroyed the law under which it had been imposed."). Thus, the interpretive exercise does not involve considering the new legislation in a vacuum. Instead, § 109 "expressly provides that Congress will indicate exceptions to the effect of the saving statute in the repealing statute." *United States v. Jacobs,* 919 F.2d 10, 13 (3d Cir. 1990).

### D. The Interplay Between the Saving Statute and the FSA

#### 1. The Current Caselaw

■■■ The FSA clearly "repeal[ed]" that portion of 21 U.S.C. § 841(b) adopted in the 1986 Act that set forth the 100-to-1 ratio and the mandatory minimum sentences attached to the relevant drug quantities. It is equally clear, and both sides agree, that nothing in the FSA "*expressly provides*" that the "penalt[ies], forfeiture, or liabilit[ies] incurred" under the prior version of § 841(b), the version in force at the time of the offense conduct here, should abate upon the FSA's passage. Nor is there any dispute that it would have been easy for Congress to have expressly provided that the FSA should apply either to those not yet sentenced as of its enactment, or even to all who might still be serving sentences under the 1986 Act. *See*

*Taylor,* 123 F.Supp. at 923 ("Had Congress so intended it could readily have made available as to those guilty of offenses committed prior to the effective date of the [repealing] Act the benefit of the reduced penalty.").

Recognizing this, a number of courts to have confronted the question—and *all* of the Courts of Appeals to have done so— have concluded that the FSA has no retroactive application to offenses committed prior to its enactment. *See, e.g., United States v. Finch,* No. 10–1157, 630 F.3d 1057, 1062–63, 2011 WL 31517, at *4 (8th Cir. Jan. 6, 2011); *United States v. Patillo,* No. 08–3473, 403 Fed.Appx. 761, 767–68, 2010 WL 5018228, at *5 (3d Cir. Dec. 9, 2010) (unpublished); *United States v. McAllister,* No. 10–4387, 401 Fed.Appx. 818, 820 n. *, 2010 WL 4561395, at *1 n. * (4th Cir. Nov. 12, 2010) (unpublished) (citing § 109); *United States v. Brewer,* 624 F.3d 900, 909 n. 7 (8th Cir.2010) ("[T]he Fair Sentencing Act contains no express statement that it is retroactive, and thus the 'general savings statute' ... requires us to apply the penalties in place at the time the crime was committed."); *United States v. Bell,* 624 F.3d 803, 814 (7th Cir. 2010) (same, citing § 109); *United States v. Gomes,* 621 F.3d 1343, 1346 (11th Cir. 2010) (same); *United States v. Carradine,* 621 F.3d 575, 580 (6th Cir.2010) (same); *see also United States v. Dickey,* No. 09–CR–34, 759 F.Supp.2d 654, 659–61, 665, 2011 WL 49585, at *6–7, *11 (W.D.Pa. Jan. 4, 2011) (holding that § 109 preserves the penalties in place prior to the FSA for pre-FSA conduct and declining to apply the FSA retroactively); *United States v. Patterson,* No. 10–CR–94, 2010 WL 5480838, at *1–2 (S.D.N.Y. Dec. 30, 2010) (same); *United States v. Crews,* No. 06–CR–418, 755 F.Supp.2d 666, 666–68, 671–72, 2010 WL 5178017, at *1, *5 (W.D.Pa. Dec. 20, 2010) (same); *United States v. Tejeda,* No.

07–CR–502, —— F.Supp.2d ——, ——, 2010 WL 4967977, at *2 (S.D.N.Y. Dec. 2, 2010) (holding that defendant was to be sentenced under the mandatory minimum in place at time of defendant's offense, "rather than the more lenient scheme adopted by the FSA"); *United States v. Holmes,* No. 10–CR–110, 2010 WL 4961657, at *4 (E.D.Va. Dec. 1, 2010) (agreeing "with the overwhelming weight of authority" and holding that "the FSA's reduced penalty provisions do not retroactively apply to offenses committed prior to enactment of the FSA"); *United States v. Hernandez,* No. 02–CR–1213, 2010 WL 4683573, at *2 (S.D.N.Y. Nov. 17, 2010) (defendant not entitled to reduction of sentence pursuant to FSA because § 109 "bar[s] the retroactive application of the FSA, since the FSA does not 'expressly provide' that it has 'the effect to release or extinguish' the previous penalty."). The Second Circuit has joined this consensus:

> [T]he FSA contains no express statement that it is intended to have retroactive effect nor can we infer such intent from its language. As a result, the FSA cannot be applied to reduce Appellant's sentence because, inter alia, he was convicted and sentenced before the FSA was enacted.... "Because the FSA took effect after appellant committed his crimes 1 U.S.C. § 109 bars the Act from affecting his punishment."

*United States v. Diaz,* 627 F.3d 930, 931 (2d Cir.2010) (per curiam) (alterations omitted) (quoting *Gomes,* 621 F.3d at 1346); *see also United States v. Glover,* No. 09–CR–1725, 398 Fed.Appx. 677, 680–81, 2010 WL 4250060, at *2 (2d Cir. Oct. 27, 2010) (summary order) ("The Act con-

tains no express statement that it is intended to have retroactive effect nor can we infer such intent from its language. *See* 1 U.S.C. § 109 Consequently, we must apply the mandatory minimum in effect at the time [the defendant] committed the offense in question"). Other courts have reached the same conclusion with respect to the FSA's retroactive effect (or lack thereof) without referencing § 109. *See, e.g., United States v. Hall,* No. 09–10216, 403 Fed.Appx. 214, 217, 2010 WL 4561363, at *3 (9th Cir. Nov. 10, 2010) (unpublished); *United States v. Lewis,* 625 F.3d 1224, 1228 (10th Cir.2010).

Defendants note that in each of these circuit court cases, the defendant seeking the application of the FSA to his conduct had been sentenced prior to the FSA's passage.[19] As Defendant Anderson points out, there are a number of different classes of cases to which the Act might potentially be applied—for instance, cases involving defendants who had been sentenced prior to August 3, 2010, defendants who had been convicted prior to August 3, 2010, but not yet sentenced, and defendants who had been indicted prior to August 3, 2010, but neither convicted nor sentenced. (Mem. of Law in Supp. of Def. William Anderson's Mot. Regarding the Fair Sentencing Act of 2010 ("Anderson Mem.") (Dkt. No. 298) 2 n. 1.) Amicus contends that it is "reasonable and sensible" to decline to apply the act to those defendants sentenced prior to its enactment, but to apply the act to sentences going forward. (Letter from Prof. Douglas A. Berman to the Court (Nov. 30, 2010), attached as Ex. 1 to Second Supple-

---

19. *But see Dickey,* 759 F.Supp.2d at 654–55, 2011 WL 49585, at *1 (applying pre-FSA mandatory minimum to defendant whose offense conduct occurred prior to FSA's passage but who had not yet been sentenced prior to its enactment); *Patterson,* 2010 WL 5480838, at *1 (same); *Crews,* 755 F.Supp.2d at 666–68, 2010 WL 5178017, at *1 (same); *Tejeda,* —— F.Supp.2d at ——, 2010 WL 4967977, at *2 (same); *Holmes,* 2010 WL 4961657, at *1 (same).

mental Decl. of Alexander E. Eisemann Regarding Amicus Reply Filed in Supp. of Mot. Regarding the Fair Sentencing Act of 2010 ("Berman Amicus Reply") (Dkt. No. 339) 2.) It is partly on this basis that several district courts have issued recent decisions concluding that the FSA *does* apply to those defendants who committed offenses prior to the Act's passage but who were still awaiting initial sentencing on August 3, 2010. *See, e.g., United States v. English,* No. 10–CR–53, 757 F.Supp.2d 900, 903–04, 2010 WL 5397288, at *3 (S.D.Iowa Dec. 30, 2010); *United States v. Whitfield,* No. 10–CR–13, 2010 WL 5387701, at *2 (N.D.Miss. Dec. 21, 2010); *United States v. Gillam,* No. 10–CR–181–2, 753 F.Supp.2d 683, 690–91, 2010 WL 4906283, at *7 (W.D.Mich. Dec. 3, 2010); *United States v. Douglas,* No. 09–CR–202, 746 F.Supp.2d 220, 230–31, 2010 WL 4260221, at *6 (D.Me. Oct. 27, 2010); Transcript of Sentencing, *United States v. Garcia,* No. 09–CR–1054 (S.D.N.Y. Nov. 15, 2010) (submitted as Ex. 2 to First Reply Mem. of Law in Supp. of Pretrial Mots. for Def. Pierre Myke ("Myke Reply") (Dkt. No. 335) (hereinafter "*Garcia* Sent. Tr.")); *see also United States v. Watson,* No. 09–CR–00055, 2010 WL 4507374, at *1 (E.D.Ark. Nov. 2, 2010) (suspending sentencing and ordering supplemental briefing in light of *Douglas* ). The leading case adopting this position is Judge Hornby's decision in *Douglas,* which most courts taking this view follow.

*Douglas* noted the weight of authority supporting the conclusion that the FSA does not apply to criminal conduct occurring prior to August 3, 2010, but stated that "[u]nlike this case, . . . all those defendants had already been sentenced before August 3, 2010." *Douglas,* 746 F.Supp.2d at 224–26, 2010 WL 4260221, at *3; *see also United States v. Butterworth,* No. 06–CR–62, 2010 WL 4362859, at *1 (D.Me. Oct. 27, 2010) (Hornby, J.) (distinguishing *Douglas* in denying motion to amend sentence because *Butterworth* defendant had already been sentenced prior to August 3, 2010). Judge Scheindlin in *Garcia* came to a similar conclusion, largely following *Douglas.* *Garcia* Sent. Tr. at 9–10 ("[The Government's] position seemed to rely so heavily on these circuit cases which were easily distinguishable. These are sentences that are already imposed and people want to vacate sentences based on the new law. That is surely a different issue."); *see also id.* at 12 (adopting *Douglas* opinion). Finally, a few courts have, in dicta, made statements supporting the existence of a distinction between defendants sentenced before or after August 3, 2010. *See Lewis,* 625 F.3d at 1228 ("[The FSA] is not . . . retroactive and thus does not apply to this case. It does, on the other hand, relegate this case to a relatively short shelf-life, inasmuch as defendants being sentenced henceforth will be sentenced under a different applicable ratio."); *United States v. Trice,* No. 06–CR–20364, 2010 WL 3504546, at *2 n. 2 (E.D.Mich. Sept. 7, 2010) ("Notably, if Defendant were to be convicted and sentenced today, the ten-year minimum may not apply because the [FSA] . . . raised the quantity of crack cocaine that must be distributed from 50 grams to 280 grams The statute did not, however, explicitly make those changes retroactive.").

With the greatest respect, this Court disagrees with these decisions and concludes that there is no distinction between a defendant who is sentenced before or after the effective date of the FSA for retroactivity purposes so long as such a defendant committed the offense prior to the Act's passage. If the Saving Statute applies to preserve prosecutions under the old statutory scheme, there is no basis for drawing a distinction among defendants based on the status of their case at the

time of the FSA's enactment. Put another way, the view embraced by Defendants here, and the *Douglas* court, is identical to that adopted by the Ninth Circuit in *Stephens* and rejected by the Supreme Court and Second Circuit—that despite § 109's language, its application can differ depending on whether the defendant is sentenced before or after the new law's enactment. As described above, the text of the Saving Statute compels a different conclusion: if § 109 applies, the repealed statute "shall be treated as *still remaining in force* for the purpose of *sustaining any proper action or prosecution* for the enforcement" of such penalties as would be imposed pursuant to the repealed statute. 1 U.S.C. § 109 (emphasis added). A prosecution based on conduct that was criminal when it was committed is obviously a "proper . . . prosecution," and the effect of the Saving Statute is to preserve the prosecution notwithstanding the later repeal of the statute under which the "penalty, forfeiture, or liability" was initially "incurred." Moreover, as noted, the Supreme Court and the Second Circuit have held that a saving clause's reference to "prosecutions" includes sentencing. *See Bradley*, 410 U.S. at 608–09, 93 S.Ct. 1151 (the saving clause of the 1970 Act, preserving "[p]rosecutions for any violation of law occurring" prior to the new act's effective date, also preserved sentences imposed pursuant to the old statute after the defendant was convicted); *Ross*, 464 F.2d at 379 (same, and suggesting the same is true for § 109).

Therefore, the Saving Statute sustains an *entire* prosecution, including the imposition of a sentence, arising from a since-repealed statute unless the repealing statute expressly provides otherwise, and there is no basis to argue that while the Saving Statute might prevent the abatement of a *prosecution* against a defendant, it would not cover the *sentence* that

is a part of that prosecution. A contrary rule is foreclosed by binding authority. *See Marrero*, 417 U.S. at 661–64, 94 S.Ct. 2532 (holding that the Saving Statute prevented a defendant sentenced under a statutory scheme forbidding parole eligibility from receiving parole even though the old statute had been repealed by the 1970 Act); *Klump*, 536 F.3d at 120–21 (applying the mandatory minimum sentence in place at the time of the defendant's conduct, rather than at the time he was sentenced, citing § 109); *Smith*, 354 F.3d at 175 ("[Section] 109 saves the penalties from the date of [the defendant's] initial offense."); *Ross*, 464 F.2d at 379 n. 5 ("Ross argues that *Fiotto* is not controlling, because Ross' conviction, unlike Fiotto's, occurred after the effective date of the new Act. That Ross' second conviction came after the effective date, however, is irrelevant."). Indeed, the Supreme Court's and Second Circuit's treatment of this distinction has been echoed by a number of the courts addressing the retroactive effect of the FSA, noting that the Saving Statute's application means that a court should sentence defendants whose crimes were committed before August 3, 2010 to the mandatory minimums in the now-repealed version of § 841(b). *See Carradine*, 621 F.3d at 580 ("The 'general savings statute,' . . . requires us to apply the penalties in place at the time the crime was committed, unless the new enactment expressly provides for its own retroactive application."); *see also, e.g., McAllister*, 401 Fed.Appx. at 820 n. *, 2010 WL 4561395, at *1 n. *; *Glover*, 398 Fed.Appx. at 680–81, 2010 WL 4250060, at *2; *Gomes*, 621 F.3d at 1346. Although Defendants dismiss these pronouncements as "dicta" as applied to defendants who have not yet initially been sentenced, that does not mean they are incorrect statements of the law.[20]

---

**20.** This is not to say that Congress could not

have "expressly provide[d]" in the FSA that

Therefore, if the Saving Statute applies to the FSA, it would preserve prosecutions initiated and sentences imposed pursuant to the pre-FSA statutory scheme based on pre-FSA conduct, notwithstanding the fact that the Defendants here have not yet been sentenced. The Saving Statute, unlike some of its state counterparts, requires the application of "the mandatory minimum in effect at the time [the Defendants] committed the offense in question." *Glover,* 398 Fed.Appx. at 680, 2010 WL 4250060, at *2; *see also Ross,* 464 F.2d at 379 n. 5 (when a saving clause in a repealing statute preserves the "prosecution" against a defendant, the defendant must be sentenced pursuant to the repealed statute even if the defendant's *conviction* happens after the effective date of the repealing statute).

### 2. Applying the Saving Statute to the FSA

■ The Court already has noted that the FSA "repeal[ed]" the 1986 Act's sentencing scheme, as required for § 109 to be applicable. Defendants and amicus advance a number of arguments why the Saving Statute should nevertheless not apply to preserve the imposition of pre-FSA mandatory minimum sentences in this case. First, § 109 does not apply because the FSA does not alter any penalty that was in existence under the prior version of § 841(b), but rather simply re-calibrates the quantity of drugs necessary for a defendant to be subject to a mandatory minimum. (*See* Def. Fred Cannon's Mem. of Law ("Cannon Mem.") (Dkt. No. 257) 3–4.)

Second, § 109 does not apply to "remedial or procedural" changes in the law. (*Id.* at 5.) Third, there are indications in both the text and legislative history of the FSA that Congress intended the Act to apply to all sentences going forward following its enactment. (*See id.* at 8–10; Anderson Mem. 10–14; Mem. of Law in Supp. of Pretrial Mots. for Def. Pierre Myke ("Myke Mem.") (Dkt. No. 284) 6–14; McCrae Br. 9–11; Letter from Prof. Douglas A. Berman to the Court (Oct. 21, 2010) ("Berman Amicus Letter"), attached as Ex. 1 to Supplemental Decl. of Alexander E. Eisemann Regarding Amicus Submission Filed in Supp. of Mot. Regarding the Fair Sentencing Act of 2010 (Dkt. No. 308) 1–4). Fourth, § 109 does not apply when the repealed law no longer serves any valid "legislative purpose." (Myke Mem. 16.)

#### a. The FSA's Change to the Prior Version of 21 U.S.C. § 841(b)

Defendant Cannon advances the argument that the FSA does not constitute a true "repeal" of prior law within the meaning of § 109, because the Act does not "release or extinguish" a "penalty, forfeiture, or liability" contained in the prior version of 21 U.S.C. § 841(b) adopted as part of the 1986 Act.[21] (Cannon Mem. 3.) Instead, he contends, the FSA merely "modified the extent to which the amount of drugs involved in the offense cabins the court's sentencing discretion," and left in place the five- and ten-year mandatory minimum and statutory maximum sen-

---

the Act would apply to all defendants who committed offenses prior to its enactment, or to a subclass thereof. As discussed below, however, Congress did not do so, and *absent* any such express declaration setting the parameters of retroactive application (if any), the Saving Statute's plain language does not allow for such distinctions.

**21.** As discussed above, while Cannon's motion itself may not be ripe, as he has not been convicted and has not proffered that his decision to enter a guilty plea depends on retroactive application of the FSA, the other moving Defendants whose claims are ripe have all adopted the arguments made by Cannon and the other Defendants who submitted Memoranda of Law.

tences that were a part of the pre-amendment statute. (*Id.* at 4.) He likens the drug quantities listed in § 841(b) to "sentencing factors" that trigger a mandatory minimum, and argues that the FSA only altered the details of those factors rather than changing the ultimate amount of punishment to which any defendant may be subject to for cocaine offenses. (*Id.* (citing *Harris v. United States,* 536 U.S. 545, 566–67, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002)).)

The argument is without merit because the only characteristic of a statute covered by the Saving Statute is that it "repeal[s]" another statute. 1 U.S.C. § 109. Here, the FSA obviously "repealed"—i.e., abrogated by legislative act, *see* Black's Law Dictionary 1325 (8th ed. 2004)—those provisions of § 841(b) that provided for a mandatory minimum to be imposed for offenses involving 5 and 50 grams of crack. If the Saving Statute did not bar its effect, moreover, the FSA would indeed have the effect of "releas[ing] or extinguish[ing]" a "penalty ... incurred" under the prior statutory scheme—for those defendants who would have been subject to a mandatory minimum under the old scheme due to the quantity of drugs involved in their offense but who would not be subject to the same minimum if the FSA were applied. *See Bell,* 624 F.3d at 814 ("[T]he FSA expressly amended the punishment portion of 21 U.S.C. § 841."). Those minimum sentences were "penalt[ies] ... incurred" under the pre-amendment § 841(b), and even though, under the FSA, the Court could exercise its *discretion* to impose the exact same *amount* of punishment as would have been *required* by the mandatory minimums, the effect of the Saving Statute, again, is to preserve those penalties incurred under the repealed statute. *See Smith,* 354 F.3d at 175 ("[Section] 109 saves sentencing provisions in addition to substantive laws."); *Douglas,*

746 F.Supp.2d at 226–29, 2010 WL 4260221, at *4 (noting that the FSA "extinguishes the mandatory minimum of ten years for a defendant with [a certain] quantity of crack, even though a sentencing judge could still impose a ten-year penalty"); *Holiday v. United States,* 683 A.2d 61, 73 (D.C.1996) ("In this connection, *Marrero* makes clear that when a statute restores sentencing discretion over an option previously foreclosed (in that case parole eligibility), the repealer has 'extinguished' a mandatory penalty—triggering application of the general savings statute—even though the sentencing judge could still achieve the result of the repealed statute (*e.g.,* foreclose parole) through the exercise of discretion in a particular case.").

For similar reasons, the Court rejects Cannon's second argument against the application of the Saving Statute: that the statute does not bar the retroactive application of "remedial or procedural changes." (Cannon Mem. 5.) In *Marrero,* the Supreme Court noted that "the general saving clause does not ordinarily preserve discarded remedies or procedures," and cited *Hertz v. Woodman,* 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001 (1910) and *United States v. Obermeier,* 186 F.2d 243 (2d Cir.1950) for this proposition. *Marrero,* 417 U.S. at 661, 94 S.Ct. 2532. As *Obermeier* explained, however, the reference to "remedies or procedures" means only that the Saving Statute does not cover situations in which a repealing statute does not affect the "penalties, forfeitures, or liabilities" imposed by the repealed statute, but rather only alters the procedures whereby substantive rights are adjudicated. *See Obermeier,* 186 F.2d at 253–55 (discussing *Hertz* and other Supreme Court cases). As an example, *Obermeier* held that § 109 does not save the limitations period provided for in an earlier statute that had been altered by a new statute,

on the ground that the limitations period did not affect "substantive rights and liabilities." *Id.* at 254 (internal quotation marks omitted). The FSA, however, does alter "substantive rights and liabilities" because it changes the "penalties" that would have been incurred for an offense involving a particular quantity of drugs under the amended version of § 841(b). *See Bell,* 624 F.3d at 815 ("[T]he FSA expressly amended the punishment portion of 21 U.S.C. § 841. No procedures or remedies were altered by the passage of the FSA.... [T]he FSA's predominant purpose was to change the punishments associated with drug offenses."); *Douglas,* 746 F.Supp.2d at 226–29, 2010 WL 4260221, at *4 (applying *Marrero* to conclude that FSA did not only implement a remedial or procedural change to the old law); *see also Ross,* 464 F.2d at 380 ("We do not believe ... that the provision for mandatory minimum sentences can be termed a 'remedy.' ").

### b. The Intent of Congress

As noted, Defendants and Amicus concede that there is no language in the FSA that expressly states that it is to apply retroactively, or retrospectively. Instead, the bulk of Defendants' and the Amicus' argument is that the Act's structure and legislative history demonstrate that Congress intended the FSA to apply to all sentences that would be imposed following its passage, regardless of the timing of the underlying offense. Specifically, section 8 of the Act requires the Sentencing Commission to implement the "guidelines, policy statements, or amendments" called for by the Act and to "conform[ ]" the Guidelines "to achieve consistency with ... applicable law" within 90 days after the FSA's enactment. FSA § 8(1)-(2). This provision, Defendants and Amicus contend, "reveals Congress's express goal of having the [Guidelines] amended immediately" in order for the Guidelines to "incorporate immediately the same 18:1 quality ratio that is reflected in the new mandatory minimum quantity thresholds set forth in the FSA." (Berman Amicus Letter 2.) Additionally, the FSA's preamble, which declares the statute's purpose to *"restore fairness to Federal cocaine sentencing,"* indicates Congress's intent that the statute apply "retrospective[ly]." (Reply Mem. of Def. William Anderson Concerning the Fair Sentencing Act of 2010 ("Anderson Reply") (Dkt. No. 338) 10.) Finally, Defendants point to numerous instances in the legislative history of the FSA in which individual members of Congress expressed their beliefs that the system of sentences in place pursuant to the pre-amendment § 841(b) was fundamentally unfair, and, in some cases, that application of the FSA's new sentencing scheme should be "retroactive."

One argument should be addressed at the outset. Defendant Anderson contends that the Court should look to the Saving Statute only when there "is no [other] evidence of Congressional intent" relating to the repealing statute's retroactive effect. (Anderson Reply 2.) In other words, if the Court is able to divine Congress's intent with respect to the FSA from other evidence, Anderson argues, the Saving Statute, which the Defendants characterize essentially as a statutory default rule, should be ignored. But this is contrary to the text and judicial interpretation of the Saving Statute. The statute says that it must be applied unless the repealing statute, here the FSA, "expressly provide[s]" that the penalties Defendants incurred under the old statutory scheme no longer remain in force. The Saving Statute, like all other pre-existing statutes against which Congress legislates, remains in effect unless something in the new, repealing statute says otherwise, either "by express declaration or necessary implication." *See Great N.,* 208 U.S. at 465, 28 S.Ct. 313. There-

fore, snippets of legislative history may not undermine the Saving Statute's effect. As the Supreme Court has explained, the "necessary implication" language in *Great Northern* means that Congress can pass a statute the effect of which is so completely inconsistent with the Saving Statute that a reviewing court must conclude, despite the absence of "magical passwords," that Congress did not intend the Saving Statute to apply, *Lockhart v. United States,* 546 U.S. 142, 145, 126 S.Ct. 699, 163 L.Ed.2d 557 (2005) (quoting *Marcello v. Bonds,* 349 U.S. 302, 310, 75 S.Ct. 757, 99 L.Ed. 1107 (1955)); *see also id.* at 149, 126 S.Ct. 699 (Scalia, J., concurring) ("When the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs, regardless of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'" (emphasis omitted)). Therefore, only if the "plain import" of the FSA is that its provisions should apply to past criminal conduct or to individuals yet to be sentenced will the Saving Statute not apply in this case.

Nothing the Defendants and Amicus cite amounts to such an express declaration or necessary implication. For example, the mere fact that Congress ameliorated § 841(b)'s sentencing scheme does not "necessarily imply" that it intended the new scheme to apply to all defendants whose cases were then pending; it merely begs the question of when Congress intended to have the new scheme take effect. *See Thompson v. Mo. Bd. of Parole,* 929 F.2d 396, 400 (8th Cir.1991) ("Legislatures constantly re-evaluate and change the substance of their penal statutes. Implementing these changes necessitates establishment of an effective date, and it is incumbent upon the legislature to determine the point in time when the new statutes take effect."). Congress presumably was fully aware of its options in this regard, and the words of the statute it passed say nothing indicating that sentences under the old law were no longer to be imposed for conduct that pre-dated the FSA. *See Bowen v. Massachusetts,* 487 U.S. 879, 896, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (noting the "well-settled presumption that Congress understands the state of existing law when it legislates").

The strongest point in the Defendants' favor is FSA § 8's grant of "Emergency Authority" to the Sentencing Commission to conform the Guidelines to "achieve consistency with other guidelines provisions and applicable law" within 90 days. This section persuaded the *Douglas* court (and others relying on *Douglas*) to apply the FSA retrospectively. As the *Douglas* court observed: "[T]he new Guidelines cannot be 'conforming' and 'achieve consistency' (Congress's express mandate) if they are based upon statutory minimums that cannot be effective to a host of sentences over the next five years until the statute of limitations runs on pre-August 3, 2010 conduct." *Douglas,* 746 F.Supp.2d at 228, 2010 WL 4260221, at *4. But § 8 is not an "express" provision requiring that the new mandatory minimums should apply to past criminal conduct, or even *only* to past offenders who have yet to be sentenced. Nor is it a "necessary implication" that Congress so intended. Rather, § 8 only makes apparent that Congress intended the Guidelines to match whatever mandatory minimum sentences could be imposed under "applicable law," FSA § 8(2), which includes the sentencing reductions and *enhancements* under the FSA, but this does not tell us which is the "applicable law" for each person sentenced after the FSA was enacted. Indeed, it seems perfectly rational for Congress to have wanted the Guidelines to correlate to the changes wrought by the FSA for defendants to be sentenced under the FSA's

new mandatory minimums, but that is not the same as requiring that all defendants be sentenced pursuant to the FSA's lower mandatory minimums for conduct that predates the FSA. Such an outcome, "by which ... the [resulting] sentences are a function of when the sentencing occurs," is hardly a *necessary* implication of the FSA's terms nor does it logically follow from its structure. *Patterson*, 2010 WL 5480838, at *2.

Nor is there a conflict between the new Guidelines and the old law, as even defendants otherwise subject to the pre-FSA mandatory minimums may still benefit from any ameliorative changes in the Guidelines if their Guidelines ranges exceed the old mandatory minimum sentences, or if they are eligible for "safety valve" relief from the old mandatory minimums. Such a scenario is consistent with the FSA and with sentencing law generally, as ameliorative changes to the Guidelines that do not conflict with a statute are applied to defendants regardless of the date of the offender's conduct. *See* 18 U.S.C. § 3553(a)(4) (requiring sentencing court to consider, inter alia, "the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the ... defendant as set forth in the guidelines ... that ... are in effect on the date the defendant is sentenced").[22]

And, to the extent the "new" Guidelines might conflict with the "old" statutory mandatory minimums, the Second Circuit has made clear that it is the statutory mandatory minimums that are to govern. *See Smith*, 354 F.3d at 175 ("[W]hen an act of Congress conflicts with a Guideline, the statute controls."); *see also Stinson v. United States*, 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (noting that commentary in the Guidelines Manual is "authoritative unless it violates ... a federal statute"); U.S.S.G. § 5G1.1(b) (2010) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."). Thus, the existence of a new, more lenient Guideline provision does not allow, let alone require, a court to ignore the old law governing maximum and mandatory minimum sentences. This was the precise holding in the Second Circuit's decision in *Smith*. In that case, when the defendant committed his original offense, the relevant statutory and Guidelines provisions required that a person who committed a narcotics-related supervised release violation be imprisoned to a term equal to one-third of the super-

---

**22.** The *Douglas* court relied on § 3553(a)(4) to suggest that Congress' directive that the Commission make emergency changes to the Guidelines means that the FSA is to apply retrospectively. 746 F.Supp.2d at 229–30, 2010 WL 4260221, at *5 ("Congress instructed the Commission to make such changes and make them immediately, under an existing statutory structure that makes them apply to those who have already offended but who have not yet been sentenced [citing § 3553(a)(4)]. It would be a strange definition of 'conforming' and 'consistency' to have these new amended Guidelines go into effect while the old and therefore inconsistent statutory minimums continued."). However, § 3553(a)(4) does not apply to changes in statutory penalties. *See United States v. Cook*, 890 F.2d 672, 675–76 (4th Cir.1989); *Margiotta v. United States*, 788 F.Supp. 145, 148 (E.D.N.Y.1992). Therefore, nothing in § 3553(a)(4) necessarily implies that the new statutory mandatory minimum penalties in the FSA are to apply retrospectively or retroactively, just because Congress directed the Commission to lower the crack Guidelines. *See United States v. Stewart*, 865 F.2d 115, 118 (7th Cir.1988) (applying the Saving Statute to hold that § 3553(a)(4) did not apply to defendant whose conduct pre-dated the Sentencing Reform Act of 1984); *Holmes*, 2010 WL 4961657, at *3 (rejecting analysis of § 3553(a)(4) in *Douglas*).

vised release period. 354 F.3d at 173. However, subsequent to the defendant's underlying offense conduct, but before his supervised release violation, Congress amended the statutory provision, eliminating the mandatory imprisonment requirement, giving a court discretion on what term of imprisonment, if any, to impose for such supervised release violations. The Commission amended the relevant section of the Guidelines accordingly. *Id.* The defendant, however, was sentenced under the old law and appealed. *Id.* at 172. The Second Circuit rejected the defendant's claims, deciding that § 109 barred retroactive application of the new law. *Id.* at 175. In so ruling, the Second Circuit found it "easy" to dispel the defendant's "argument that the Guidelines themselves required the district court to apply the version in effect at the time of sentencing." *Id.* "[A]t best," the court held, "the sentencing judge would then be confronted with a conflict between the governing statute—the older version of [the statutory minimum]—and the Guidelines. In such cases the statute controls." As then Judge Sotomayor explained: "The version of the Guidelines in effect at the time of [the defendant's] re-sentencing ... must yield to the conflicting statutory requirement that [the defendant] serve a term of imprisonment for his supervised release vio-

lation equal to one-third of the term of supervised release." *Id.*

In the FSA, Congress both reduced the mandatory minimum sentences and asked the Commission to adopt Guidelines that will be consistent with these new, lower mandatory minimums. Conformity between the two makes sense, but it cannot be said to expressly apply the new mandatory minimums to conduct that pre-dates the FSA. And, that the new Guidelines may apply to pre-FSA conduct does not necessarily imply that Congress intended to apply the mandatory minimum sentences to such conduct. *See Patterson,* 2010 WL 5480838, at *2 ("[I]t is one thing to direct, as the FSA does, that the Sentencing Guidelines, which are now discretionary, be promptly conformed and applied to a new regime, and quite something else to infer from this that Congress necessarily intended that mandatory minimums, which are legislative dictates, be reduced retroactively in sentences following the date of the new enactment, notwithstanding the presumption of the Savings Statute."). In short, the Court finds that there is insufficient reason to read Congress' direction to the Sentencing Commission as providing, by express language or necessary implication, that the FSA applies retroactively (or retrospectively) to individuals who sold crack before the FSA was enacted.[23]

---

**23.** In reaching the opposite conclusion, the *Douglas* court placed much weight on a footnote in *Marrero,* in which the Court casually referred to § 109 as barring retroactive application of the repealing statute unless Congress provided otherwise "by '*fair* implication or expressly.'" *Douglas,* 746 F.Supp.2d at 229–30, 230–31, 2010 WL 4260221, at *5, *6 (quoting *Marrero,* 417 U.S. at 659 n. 10, 94 S.Ct. 2532) (emphasis in original). But even *Douglas* acknowledged that *Marrero* did not limit, let alone overrule, *Great Northern,* and it is the *Great Northern* "express provision or necessary implication" formulation that courts consistently have applied. *See Hertz,*

218 U.S. at 218, 30 S.Ct. 621 (noting the "significance" of the Saving Statute is that new legislation will not repeal old law unless a "special character" of the new law, "by plain implication, cuts down the scope and operation of the [Saving Statute]." (citing *Great Northern* )); *Klump,* 536 F.3d at 120 (noting that the new statute "contains no provision expressly prohibiting its application to defendants ... who were convicted ... before the [old] statute expired"); *Jacobs,* 919 F.2d at 13 (noting that the Saving Statute "expressly provides that Congress will indicate exceptions to the effect of the [S]aving [S]tatute in the *repealing* statute" (emphasis in original));

Defendants' remaining pieces of evidence indicating Congress's supposed intent are less substantial. The use of the single word "restore" in the FSA's preamble, stating that the Act's purpose is to "restore fairness to Federal cocaine sentencing," does not indicate, either expressly or by necessary implication, Congress's intent to apply the statute to sentences for past conduct. There is no doubt that Congress, twenty-four years after passing the 1986 Act, might well have wanted to "restore" fairness in sentencing by lowering the ratio between crack and powder cocaine, but it was silent as to when the restoration was to begin, or more specifically, that the FSA should cover criminal conduct that pre-dates its enactment. At a minimum, the use of "restore" in the preamble hardly constitutes an express command, or even a necessary implication, that the FSA should apply retroactively.[24]

*Ross,* 464 F.2d at 379 (holding that the 1970 Act "did not expressly extinguish mandatory minimum sentences"); *Ex parte Lamar,* 274 F. 160, 172 (2d Cir.1921) (citing *Great Northern* and declining to retroactively apply the Webb Act, which partially repealed the Sherman Act, because the new law did not "expressly provide" for retroactive application); *Johnson v. Agnant,* 480 F.Supp.2d 1, 5 (D.D.C.2006) (citing the "necessary implication" language of *Great Northern); Margiotta,* 788 F.Supp. at 148 ("Absent explicit Congressional language, a defendant is therefore not entitled to the benefit of reductions in a criminal penalty statute enacted between the time of his offense and the time of sentencing").

Indeed, attempting to discern a "fair" implication of retroactivity is incongruous with the directive in the Saving Statute that retroactivity be "expressly provide[d]" for in the new law. *See Crews,* 755 F.Supp.2d at 671–72, 2010 WL 5178017, at *5 (rejecting "thorough and detailed" analysis *in Douglas* that retroactivity may be discerned from assessment of "Congress' will" in absence of any express provision in repealing law). Such plain language in the Saving Statute requires Congress to be definitive and clear when intending to retroactively apply a repealer, and not leave the question to what one might "fairly" divine about such intent. *See Jacobs,* 919 F.2d at 12 ("The plain language of the [S]aving [S]tatute indicates that it prevents statutory amendments from affecting penalties retroactively, even if they do so indirectly."); *United States v. De Simone,* 468 F.2d 1196, 1199 (2d Cir.1972) (noting that no section of the 1970 Act "meets the command of section 109 that the 'repealing Act ... expressly provide' for extinguishment of a prior 'penalty' "); *Bradley,* 455 F.2d at 1190 ("Whether a repealed provision remains in force as to pre-repeal activities is a matter of Congressional intent to be determined from statutory savings provisions."); *Bowen v. United States,* 171 F.2d 533, 534 (5th Cir. 1948) ("We are aware of no reason, rule, or decision that requires a different conclusion as to criminal prosecution under the authority of Sec. 109 for acts occurring prior to the repeal of the former statute where neither the former statute nor the repealing statute contain no express provision to the contrary."); *Holiday,* 683 A.2d at 80 ("These general [saving] statutes ... cannot be flicked aside as though legislative intent can, and must, be divined without reference to them."); *see also Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (internal quotation marks and citations omitted)).

24. The Court is doubtful that the words of a preamble expressing Congress's purpose at a high level of generality can control a very specific question of a statute's application. *Cf. Cnty. of Suffolk v. First Am. Real Estate Solutions,* 261 F.3d 179, 189 (2d Cir.2001) ("[Plaintiff] trumpets a portion of the legislative declaration introducing the law.... This statement, in a preamble no less, may assist in the determination of the Legislature's purpose, but it certainly is not conclusive."). And, in any event, the Supreme Court has indicated that the presence of the word "restore" in a statute's preamble should not be taken as a signal to apply the provisions of the new statute retroactively. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 307 n. 7, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("We do not suggest that Congress' use of the word 'restore' necessarily bespeaks an intent to restore *retroactively.* For example, Congress

Finally, the Defendants' discussion of legislative history, though extensive, adds little to the analysis (if any is needed at all, given the plain language of the FSA). Retroactive application of the FSA was discussed by members of Congress in the context of whether or not the new sentencing scheme should be applied to those already sentenced under the 100–to–1 crack-cocaine ratio.[25] However, the Parties have not cited any references, and the Court is unable to find any, to discussion of the specific application the Defendants urge here: application of the FSA to defendants whose crimes were committed prior to August 3, 2010, but who would not yet be sentenced by that date. That this aspect of retroactivity appears not to have been much discussed, if at all, could suggest that members of Congress thought that the statute's application to sentences going forward was so obvious that it was not worthy of mention in the statute's text. Or perhaps the omission is telling, indicating that there was *no* congressional consensus regarding the FSA's applicability to past criminal conduct. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 261, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("It is entirely possible—indeed, highly probable—that, because it was unable to resolve the retroactivity issue with the clarity of [prior] legislation, Congress viewed the matter as an open issue to be resolved by the courts."). Or perhaps members of Congress did not consider the question at all. It is enough for this Court to conclude that nothing in the text of the FSA itself or in its legislative history indicates that the "necessary implication" of the statute was to avoid applicability of the Saving Statute.[26]

might, in response to a judicial decision that construed a criminal statute narrowly, amend the legislation to broaden its scope; the preamble or legislative history of the amendment might state that it was intended to 'restore' the statute to its originally intended scope.... '[T]o restore' might sensibly be read as meaning 'to correct, from now on.' ").

**25.** The original bill introduced in the House to alter the cocaine sentencing ratios indicated that its amendments would "apply to any offense committed on or after 180 days after the date of enactment of this Act," but also directed the Sentencing Commission to promulgate corresponding Guidelines changes immediately. *See* Drug Sentencing Reform and Cocaine Kingpin Trafficking Act of 2007, H.R. 4545, 110th Cong. §§ 8, 11 (2007). The bill stated that there would "be no retroactive application of any portion of this Act." *Id.* § 11. The corresponding bills introduced in the Senate contained similar provisions. *See* Drug Sentencing Reform and Cocaine Kingpin Trafficking Act of 2007, S. 1711, 110th Cong. § 11 (2007); Drug Sentencing Reform Act of 2007, S. 1383, 110th Cong. § 204 (2007). These provisions were evidently eliminated in the final bill.

It is very clear in the legislative history that some members of Congress and testifying witnesses were concerned about retroactive application of the FSA to prisoners already sentenced, while others suggested support for retroactivity. *See* 2009 Senate Hearing, *supra* note 6, at 11–13, 18–21. At a Senate hearing, for example, the Assistant Attorney General for the Criminal Division stated that the Department of Justice would consider the issue, and that "[w]hether at the end of the day the issue of retroactivity is one that should be adopted, I am sure that will be a topic that will be discussed." *Id.* at 11.

**26.** Defendants cite to a letter from Senators Richard Durbin and Patrick Leahy, dated November 17, 2010, to Attorney General Eric Holder. (Letter from Sens. Richard Durbin and Patrick Leahy to Eric Holder, Att'y Gen. of the U.S. (Nov. 17, 2010), attached as Ex. to Letter from Thomas F.X. Dunn to the Court (Nov. 18, 2010) (Dkt. No. 329).) In this letter, the Senators, both members of the Judiciary Committee, explained that they were "disturbed to learn that the Justice Department apparently has taken the position that the [FSA] should not apply to defendants who have not yet been sentenced if their conduct took place prior to the legislation's enactment." In response to this position, the Senators did not cite to any provision in the statute or anything definitive in the legislative

### c. "Frustration" of the FSA's Purpose

Defendants Myke and McCrae advance a somewhat different argument with respect to Congress's intent. They note that the Supreme Court has held that the Saving Statute does not sustain a prosecution for violation of a repealed statute when Congress has determined that application of the repealed statute would "no longer serve any legislative purpose." (Myke Mem. 17; *see also* McCrae Br. 9.) Defendants contend that the FSA and its legislative history demonstrate that Congress thought any further application of the repealed mandatory minimum penalties would be unfair and should not be done because the purpose served by such sentences has been repudiated. (Myke Mem. 16–20.) The argument principally relies on two cases, *Hamm v. City of Rock Hill*, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964), and *United States v. Chambers*, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934), which held that the Saving Statute did not prevent the abatement of prosecutions for criminal acts that subsequently, via statute and constitutional amendment respectively, had been made legal.

In *Hamm*, the Supreme Court held that § 109 would not bar the abatement of state law trespass prosecutions for "sit ins" following the passage of the Civil Rights Act of 1964, which banned discrimination in public accommodations. *Hamm*, 379 U.S. at 314, 85 S.Ct. 384. *Hamm*

relied, in turn, on *Chambers*, which held that § 109 did not bar the abatement of violations of the National Prohibition Act following the passage of the Twenty–First Amendment, which undercut the constitutional authority under which Congress had passed the Prohibition statutes. *Chambers*, 291 U.S. at 224, 54 S.Ct. 434 ("[Section 109] applies, and could only apply, to the repeal of statutes by the Congress and to the exercise by the Congress of its undoubted authority to qualify its repeal and thus to keep in force its own enactments.... The Congress, however, is powerless to expand or extend its constitutional authority.").

The Second Circuit has concluded that *Hamm* and *Chambers* do not apply in cases like this one. In *Ross*, the Second Circuit addressed *Hamm* and *Chambers* by noting that both of those cases involved a change in the governing law that gave the defendants facing prosecution a "substantive right" to do the conduct "which previously had been the object of criminal sanctions." *Ross*, 464 F.2d at 380. In contrast, the defendant in *Ross* committed his crime, a second narcotics offense, when a ten-year mandatory minimum applied but, prior to his sentence, the 1970 Act repealed the mandatory minimum for second offenders. *Id.* at 377–78. The Saving Statute, the Second Circuit held, "required the district court to sentence Ross ...

---

history that required the Justice Department to apply the FSA retroactively. Instead, the Senators urged that, "[r]egardless of the legal merits of [the Justice Department's] position [that the FSA is not to be applied retrospectively], the Justice Department has the authority and responsibility to seek sentences consistent with the Fair Sentencing Act as a matter of prosecutorial discretion."

While this may be an accurate statement of the Executive Branch's discretion in these cases, *see infra* at 165 n. 30, it is not evidence that Congress itself required (or intended) the

FSA to be applied retroactively (or retrospectively). Indeed, one court has observed that "by advocating that the Government adopt this more lenient position, the Senators effectively concede that the statute does not so require." *Tejeda*, —— F.Supp.2d at —— n. 2, 2010 WL 4967977, at *2 n. 2. And, of course, "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage." *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

pursuant to" the repealed statute. *Id.* at 379. *Ross* was, therefore, "entirely different" from *Hamm* and *Chambers* because "[t]he conduct for which [the prior statute] required mandatory minimum sentences"—a second narcotics offense—"continues to be a crime under the new Act." *Id.* at 380. This is plainly true in this case as well, as the FSA did not change the substantive criminal prohibitions Defendants are alleged to have violated.

Moreover, the Supreme Court in *Marrero* appears to have dialed back on an expansive reading of *Hamm* and *Chambers* that would bar the Saving Statute's application when "no purpose" could be served by continued application of a repealed law. In *Marrero*, the defendant pointed out that leaving him ineligible for parole, after Congress had changed the governing statute to provide for its availability, conflicted with the "basic change" intended by Congress: "jettisoning the retributive approach" of prior law "in favor of emphasis . . . upon rehabilitation of the narcotics offender." *Marrero*, 417 U.S. at 664, 94 S.Ct. 2532. The Court acknowledged the inconsistency, but concluded that such a philosophical dichotomy between the old and new laws was beyond the province of the courts to fix. *Id.* Instead, it remained for the elected branches to resolve. *Id.* As Justice Stevens has explained:

> It will frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity. Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal. A legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute.

*Landgraf,* 511 U.S. at 285–86, 114 S.Ct. 1483.

And so it is here. To the extent some in Congress felt strongly that the sentencing regime created by the 1986 Act was unfair, and fostered a perception that it was unfair, and that not another sentence under the old law should be imposed, all they had to do was persuade a majority in Congress to expressly provide in the FSA that no sentences under the 1986 Act should be imposed from the day the FSA was enacted. However, Congress did not do so, and, regardless of the reasons for such an omission, it cannot be said that a court's obligation to its limited role—here to apply the FSA and the Saving Statute—is tantamount to improperly frustrating Congress' purpose in adopting the new law if that purpose was not made clear in the text of the statute.

### 3. Constitutional Claims

Finally, Defendants and Amicus invoke both the rule of lenity and the canon of constitutional avoidance to argue that the Court should construe the FSA as applicable in this case, (Cannon Mem. 10–15; Myke Mem. 20–24; McCrae Br. 11–14; Berman Amicus Letter 4–6.) They argue that declining to apply the FSA to sentences going forward would create Equal Protection and Eighth Amendment concerns, and that the Government's decision to seek sentences that the FSA repealed violates the separation of powers. The Equal Protection argument has three components. One is the contention that it is arbitrary to impose the old, higher mandatory minimums on those not yet sentenced merely because they committed their offenses before enactment of the FSA. The second is the assertion that continuing the 100–to–1 ratio violates equal protection, because it disproportionately affects African Americans and other protected classes

of people. (Myke Mem. 13–14.) The third is a more novel and creative claim of Amicus that the failure to apply the FSA retrospectively will disproportionately harm low-level crack dealers. (Berman Amicus Reply 1–2). As crystallized at oral argument, the claim is that because some categories of serious offenders (those who sell so much crack that they would face the highest mandatory minimums under either the old or new law) will benefit from the Guidelines reductions recently adopted by the Sentencing Commission (pursuant to the FSA), it is unconstitutionally irrational that low-level crack dealers will not, if the FSA is not applied retrospectively, benefit from the lower mandatory minimums or the lower Guidelines because they fall below the old mandatory minimum thresholds. In other words, it is "minor crack offenders-and only minor crack offender[s]-[that are] denied the benefits of the FSA's new crack/powder 18:1 quantity ratio." (*Id.* at 2.) Defendants and Amicus ask in the alternative, if the Court declines to apply the FSA to this case, that the Court declare any sentences imposed under the pre-FSA version of § 841(b) unconstitutional. (Anderson Reply 15.)

▮▮▮▮ The constitutional avoidance canon is only available when a court is faced with "competing plausible interpretations of a statutory text," *Clark v. Martinez*, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005), while the rule of lenity is used only when the supposed ambiguity cannot "be resolved through normal methods of statutory construction," *United States v. Balint*, 201 F.3d 928, 935 (7th Cir.2000); *see also Callanan v. United*

*States,* 364 U.S. 587, 596, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961) ("The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers."). The FSA, as Defendants have conceded and as discussed at length above, does not expressly address its application to cases concerning pre-enactment conduct. Defendants attempt to couch this omission as the type of ambiguity that triggers use of these statutory construction canons. (Berman Amicus Letter 4–5.) But, in the context of the Saving Statute, such ambiguity does not invite application of rules of construction. If there is ambiguity about a repealing statute's retroactive reach, then the Saving Statute provides that the law at the time of offense governs. *See Stewart,* 865 F.2d at 118 (rejecting invocation of rule of lenity in support of retroactive application of Sentencing Reform Act of 1984, because Saving Statute required prospective application of new law "in the absence of evidence of a clear legislative intent that the provisions of the [Sentencing Reform Act] apply retroactively"); *United States v. Rewald,* 835 F.2d 215, 216 (9th Cir.1987) (noting that "even if the [Sentencing Reform Act] were ambiguous as to retroactivity, the Savings Clause bars retroactive application of statutes where such application would extinguish a penalty"). Therefore, the Court is unable to resort to these canons because the FSA simply does not admit of more than one "plausible interpretation" regarding its retroactive or retrospective reach.[27]

27. It also bears emphasizing that the constitutional avoidance canon is a means of vindicating *statutory* rights, by way of an argument that Congress could not have intended an interpretation of the statute that would make it unconstitutional. *See Clark,* 543 U.S. at 381–82, 125 S.Ct. 716. One could read De-

fendants' argument to be that in this case, Congress itself thought that the 100–to–1 ratio was unconstitutional, so if (pursuant to the constitutional avoidance canon) courts should not infer Congress intends results *it thinks* are unconstitutional, then it should construe the FSA to avoid such a result. (*See* Myke Mem.

Moreover, even if the FSA were amenable to construction, none of the constitutional claims has merit. The Equal Protection claims are the most substantial, but still do not carry the day. First, the result of prospective application of the FSA is, in fact, that similarly situated defendants will be treated similarly. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). All those who committed their offenses before the enactment of the FSA will be sentenced according to the statutory scheme in place at the time the offenses were committed, while all those who commit crack-related offenses after August 3, 2010, will be subject to the FSA. Defen-

dants suggest that such a temporal distinction might be discriminatory, but the Second Circuit has held that this type of "discrimination is not unconstitutional." *United States v. Zelker*, 506 F.2d 1228, 1230 (2d Cir.1974) (holding that prospective application of law reducing sentence exposure did not violate equal protection, citing *Marrero*); *accord Thompson*, 929 F.2d at 400 ("It is not irrational for a state to revise its penal laws prospectively....."); *Douglas*, 746 F.Supp.2d at 226–29, 2010 WL 4260221, at *4 ("I see no serious Fifth or Eighth Amendment concern that would cabin Congress' authority to make its new reform apply only to criminal conduct occurring after the statute's enactment ...").[28] Indeed, Defen-

9–12.) This argument assumes a collective understanding on Congress's part that simply is not reflected in the statute's text. Defendants rely largely on statements in the legislative history to the effect that the crack-powder disparity violates equal protection, but these comments of individual legislators are not reflected in the statute itself. Indeed, there were no Congressional findings to this effect, and it is not obvious from the face of the FSA that a majority of Congress, even if it thought the old sentencing regime to be unfair, believed it to be unconstitutional, or, more importantly, that not retroactively applying the FSA would be unconstitutional. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("Floor statements from two Senators cannot amend the clear and unambiguous language of a statute. We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text."); *European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 136 (2d Cir.2004) ("[T]he isolated statements of individual legislators do not express the intent of Congress as a whole ...."), *vacated on other grounds*, 544 U.S. 1012, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005); *Dickey*, 759 F.Supp.2d at 664–65, 2011 WL 49585, at *10 ("This Court is not prepared to subjugate the text of the Fair Sentencing Act by selectively citing statements made by individual legislators in order

to effectuate an intent not present in the text of the statute.").

**28.** In *Zelker*, the Second Circuit noted that the only cases that adopted a contrary position were "effectively overruled by *Marrero*." 506 F.2d at 1230. In one such case, *Alvarado v. McLaughlin*, 486 F.2d 541 (4th Cir.1973), *vacated sub nom. McLaughlin v. Prieto*, 418 U.S. 903, 94 S.Ct. 3192, 41 L.Ed.2d 1151 (1974), the Fourth Circuit held that because it was Congress' purpose, in enacting the 1970 Act, to promote rehabilitation of certain narcotics offenders, "it is difficult to find any basis in that Act, much less in reason or in fairness, for treating differently prisoners whose narcotic law offenses that took place before [the Act's passage] from those offenses occurred after that date," *Id.* at 544–45. The Supreme Court vacated this case in light of *Marrero*. 418 U.S. 903, 94 S.Ct. 3192.

The Supreme Court's rejection of *McLaughlin* in light of *Marrero* also dooms Amicus's argument that there is an Eighth Amendment violation from sentences under the 1986 Act because such sentences would no longer serve any of the permissible purposes of criminal punishment (retribution, deterrence, etc.). (Berman Amicus Letter 5.) Simply put, the import of *Marrero* is that if Congress does not expressly provide that it intends the new law to be applied retroactively, then there is no frustration of the purposes behind the new law, or, therefore, anything improper, in not applying it retroactively.

dants' proposed solution—to apply the FSA to all those *sentenced* following its enactment—does not produce any less arbitrary results. The timing of a defendant's sentence depends on a myriad of factors beyond the defendant's, counsel's, or the courts' control, starting with the speed with which the Government indicted the case and ending with the availability of counsel on a particular sentencing date. True, a rule denying application of the FSA to a defendant who committed his crime on August 2, 2010, but applying it to a defendant who committed his crime on August 4, 2010, might seem arbitrary, but so too does a rule making application contingent on the particular date on a district court's calendar a particular defendant's sentence is held—and the latter is far more arbitrary after one recognizes that sentencing dates are often flexible. As one court has explained:

> We cannot say that a legislature could not rationally conclude that the best approach would be a purely prospective one, so that all defendants who committed crimes before the statute became effective would be treated equally. Otherwise, sentencings could get caught up in manipulations with unfair results overall. Some convicted felons, for example, might be able to arrange sentencing delays to take advantage of the new sentencing scheme, whereas others could not achieve the same result before less sympathetic judges.

*Holiday*, 683 A.2d at 78–79.

Defendants rely on *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), for the proposition that "ameliorative changes in the criminal law ... [must] apply to cases pending" when the change takes place. (Myke Mem. 6–7.) In *Griffith*, the Supreme Court held that the rule set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),

should apply to cases pending on direct appeal when that decision was issued, *see Griffith*, 479 U.S. at 316, 107 S.Ct. 708, and more generally that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final," *id.* at 328, 107 S.Ct. 708. One motivation for this holding was that "selective application of new rules violates the principle of treating similarly situated defendants the same." *Id.* at 323, 107 S.Ct. 708. *Griffith*, however, does not aid Defendants. A new rule of constitutional criminal procedure would necessarily be announced in a case that had been tried under the old rule, thus creating unequal treatment among defendants tried under that rule. *Griffith* is the only solution that undoes this unequal treatment and avoids the problem that would otherwise be created by applying new rules of constitutional criminal procedure only to those cases that made it to an appellate court first. *See id.* at 327, 107 S.Ct. 708 (noting that Griffith and Batson were tried in the same court "approximately three months apart" and that "[i]t was solely the fortuities of the judicial process that determined the case this Court chose initially to hear on plenary review"). As noted above, application of new *statutes* to pending cases is quite a different situation, and the courts are loathe to assume anything about the types of compromises Congress might have made in enacting new legislation. *See Landgraf*, 511 U.S. at 285–86, 114 S.Ct. 1483. Thus, because Defendants cite no authority suggesting that *Griffith* undermines the Saving Statute, or the century's worth of caselaw applying it to situations exactly like this one, the Court is unpersuaded by this argument. *See United States v. Robinson*, No. 10–2775, 405 Fed. Appx. 72, 73, 2010 WL 5423759, at *1 (7th Cir. Dec. 29, 2010) (unpublished) ("[Defendant] has offered nothing to suggest that

*Griffith* applies equally to amendments to *legislation* that alter penalties but create no new rights, procedural or otherwise." (emphasis in original)).[29]

The other constitutional claims are no more persuasive. As to Defendants' complaint that continued imposition of the pre-FSA mandatory minimum is unconstitutional in and of itself, that position has been rejected by the circuit courts. *See, e.g., United States v. Samas,* 561 F.3d 108, 109 (2d Cir.2009) (per curiam) (rejecting Fifth Amendment Equal Protection claim), *cert. denied,* —— U.S. ——, 130 S.Ct. 184, 175 L.Ed.2d 240 (2009); *United States v. Berry,* 290 Fed.Appx. 784, 793 (6th Cir. 2008) (rejecting constitutional challenges, and collecting cases on due process, equal protection, and Eighth Amendment claims); *United States v. Moore,* 54 F.3d 92, 98–99 (2d Cir.1995) (while arguments were "compelling," the court rejected equal protection claim, concluding that there was insufficient evidence that Congress acted with discriminatory intent in passing the 1986 Act); *United States v. Clary,* 34 F.3d 709, 713–14 (8th Cir.1994) (recognizing disparate impact of higher crack sentences, but concluding that Congress adopted the 100–to–1 ratio for race-neutral reasons, and therefore rejecting equal protection claim); *United States v. Singleterry,* 29 F.3d 733, 740–41 (1st Cir. 1994) (same). In fact, the courts have rejected this claim even in the face of the updated research challenging the factual underpinnings of the 1986 Act, the data reflecting the disparate impact of crack sentences on minorities, and the recent reductions in the Guidelines for crack offenses. *See, e.g., United States v. McClellon,* 578 F.3d 846, 861–62 (8th Cir.2009)

(concluding that recent reduction in the Guidelines for crack offenses and then-pending proposals in Congress to reduce the crack-cocaine disparity did not substantiate equal protection claims, and noting that any other infirmities in the 1986 Act must be addressed by Congress), *cert. denied,* —— U.S. ——, 130 S.Ct. 1106, 175 L.Ed.2d 920 (2010); *Douglas,* 746 F.Supp.2d at 227 n. 39, 2010 WL 4260221, at *4 n. 39 (noting that the courts have repeatedly rejected equal protection and Eighth Amendment claims). If the binding authority before the FSA's enactment was that there was no constitutional violation from the 100–to–1 ratio, the Court is at a loss to see how Congress' decision to lower that ratio, but to do so only prospectively, yields a different conclusion.

Finally, the Court finds unpersuasive the valiant claim of Amicus that there is a constitutional foul from the supposed disparate impact on low-level crack dealers from prospective application of the FSA. This group, however it is defined, hardly qualifies as a suspect class, *see Cleburne,* 473 U.S. at 439–42, 105 S.Ct. 3249 (discussing characteristics of suspect classes); *cf. United States v. Coleman,* 166 F.3d 428, 430–31 (2d Cir.1999) (distinction between crack and powder cocaine offenders is not a quasi-suspect classification); *Shifrin v. Fields,* 39 F.3d 1112, 1114 (10th Cir.1994) (violent offenders are not a suspect class); *Zipkin v. Heckler,* 790 F.2d 16, 18 (2d Cir.1986) (per curiam) (incarcerated felons are not a suspect class), and so there is no need for strict scrutiny of Congress' actions as to this group. Thus, the only question is whether it is rational for Congress not to have required the FSA to

---

**29.** *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), on which Defendants also rely, is also unhelpful. (Myke Mem. 22.) That case similarly involved retroactive application of a constitu-

tional rule—that the "materiality" element of a perjury charge must be found by a jury rather than a judge. *See Johnson,* 520 U.S. at 467, 117 S.Ct. 1544.

apply retrospectively, even if the effect of such application is to require crack dealers, including low-level ones, to be sentenced under the 1986 Act for conduct that pre-dated the FSA. At bottom, this really is no different than the previously-discussed claim, rejected by the Supreme Court and Second Circuit, that it is irrational to impose on those who commit the crime under the old law sentences higher than those who commit the same crime after the ameliorative statute is enacted. And, that some crack dealers may benefit less than others from the FSA does not mean that Congress acted irrationally, let alone unconstitutionally.[30]

### III. Conclusion

The Court recognizes that over the course of the last two decades there has been growing belief among practitioners, courts, commentators, and many others that the 100–to–1 ratio that Congress hastily adopted in 1986 was based on insufficient facts and has resulted in severe sentences that have been disproportionately imposed on certain groups of individuals. By enacting the FSA, Congress appears to have responded, at least in part, to this consensus. The Court also appreciates the desire of many, including the district judges who must impose mandatory sentences, that there be no more sentences based on the 100–to–1 ratio, and that this sentiment may explain the view that the FSA should govern all sentences going forward. *See Douglas*, 746 F.Supp.2d at 231 n. 57, 2010 WL 4260221, at *6 n. 57 ("I would find it gravely disquieting to apply hereafter a sentencing penalty that Congress has declared to be unfair."). Indeed, at oral argument, counsel for Defendants, expressing similar sentiment, urged the Court to find some "play in the authority" to apply the FSA to this case. (December 8, 2010 Oral Argument Tr. 51.) But, here, in light of the Saving Statute, "we are not dealing with optional rules of statutory construction." *Holiday*, 683 A.2d at 79. It is a law that like any other must be applied as written. And while the goal of those who wish to immediately abandon the old sentencing regime in favor of that adopted in the FSA is understandable, it is a suggestion "addressed to the wrong gov-

---

**30.** Defendants make two further constitutional arguments. First, they complain the Government is violating the intent of Congress (and thus the separation of powers) by seeking sentences the FSA repudiated. That argument merely begs the question of what change the FSA accomplished; this Court has already determined that the FSA did not alter sentences for conduct committed prior to its enactment.

Second, Amicus frames the Eighth Amendment issue as a claim that the "objective indicia of society's . . . consensus" rejects the disparate treatment of crack and powder cocaine offenders pursuant to the 100–to–1 ratio, and thus that sentences under the old mandatory minimums would be disproportionate to these offenses. (Dec. 8, 2010 Oral Argument Tr. 119 (citing *Graham v. Florida*, —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010))). The Parties have not addressed whether such sentences are rejected by "objective indicia of national consensus," *id.* at 2023, or whether they would "serve[ ] legitimate penological goals," *id.* at 2026, so the Court need only say that the argument—as an argument about constitutional avoidance— again begs the question of what Congress intended with respect to pre-enactment conduct, and because, as the Court concludes, Congress did not expressly state or necessarily imply that sentences for pre-enactment conduct should change, the FSA is not indicative of a "national consensus" against imposition of the prior mandatory minimums for defendants who committed their crimes under those laws. If Congress does not pass laws reflecting the "national consensus," then the fix is for those in the consensus to persuade Congress to do so, not for courts to fiat such a consensus. In any event, the Second Circuit has rejected Eighth Amendment challenges to the "enhanced penalties for crack offenses under 21 U.S.C. § 841(b)(1)." *United States v. Payne*, 63 F.3d 1200, 1213 (2d Cir.1995).

ernmental branch." *Marrero*, 417 U.S. at 664, 94 S.Ct. 2532. As Justice Brennan has explained: "Punishment for federal crimes is a matter for Congress, subject to judicial veto only when the legislative judgment oversteps constitutional bounds." *Id.*

Here, Congress easily could have made clear its intent, if it wanted to, that the FSA apply to all individuals who had not yet been sentenced. As the Supreme Court observed (in the context of considering federal taxes due prior to and after the enactment of a repealing statute):

The saving clause does not, in terms, limit the right saved to a tax or duty which should be due and payable at the

date of the repeal. It is, perhaps, an obvious suggestion that if that had been the purpose of Congress, it would have been easy to make that purpose clear. *Hertz*, 218 U.S. at 221, 30 S.Ct. 621. But here, Congress adopted no such clear provision.

Of course, it remains a possibility that Congress still could enact legislation expressly applying the FSA to all those not sentenced as of August 3, 2010.[31] Or, it is always possible that the Executive Branch, as Senators Durbin and Leahy have suggested, could exercise its discretion, through its charging decisions, to avoid continued imposition of sentences under the old law.[32] But, in the end, it is not the

---

31. One of the main proponents of the FSA recently proposed legislation to apply the FSA to "pending cases and retroactively to certain cases that are no longer pending." *See* Fair Sentencing Clarification Act of 2010, H.R. 6548, 111th Cong. § 2(4) (2010).

32. Recently, a defendant pled guilty before this Court, pursuant to a standard plea agreement, to attempted distribution of heroin, in violation of Title 21, United States Code, Section 846. The underlying statutory violation was charged under 21 U.S.C. § 841(b)(1)(C), which imposes no mandatory minimum and a maximum of twenty years' imprisonment, and there was no quantity specified in the felony information. But, even though the defendant allocuted to attempting to sell more than a kilogram of heroin, which if it had been charged under 21 U.S.C. § 841(b)(1)(A) would have exposed the defendant to a ten-year mandatory minimum and a maximum of life imprisonment, the Government agreed that the defendant cannot face any such exposure. This is so because the quantity of narcotics is an element of the offense, and therefore must be charged and either found by a jury or admitted to by the defendant. *See United States v. Thomas*, 274 F.3d 655, 667 (2d Cir.2001) (en banc); *see also United States v. Cordoba–Murgas*, 422 F.3d 65, 72 (2d Cir. 2005) (applying *Thomas* to guilty pleas); *United States v. Gonzalez*, 420 F.3d 111, 131 (2d Cir.2005) ("[D]rug quantity is an element that must always be pleaded and proved to a jury or admitted by a defendant to support

conviction or sentence on an aggravated offense under § 841(b)(1)(A) or -(b)(1)(B). If a defendant is convicted only on a lesser unquantified drug charge, he must be sentenced pursuant to § 841(b)(1)(C), which generally provides no mandatory minimum sentence.").

Of course, the Court does not know the circumstances that led the Government to be lenient and allow this defendant to plead guilty to a charge that, the quantity of heroin notwithstanding, would avoid imposition of a mandatory minimum sentence (or a maximum of life imprisonment), and does not suggest that the Government is required, in crack cocaine cases to do the same. Rather, the only point is that the Executive Branch retains the discretion to make charging decisions that affect what sentence a defendant might, or cannot, receive.

[W]hen an act violates more than one criminal statute, the Government may prosecute[ ] under either so long as it does not discriminate against any class of defendants. Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.... [T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute,

obligation or province of the courts to fill in the gaps left by the other branches of government. Therefore, for the reasons stated herein, the pending motions to apply the FSA to this case are DENIED. The Clerk of Court is respectfully directed to close the relevant motions. (Dkt. Nos. 257, 268, 282, 296.)

SO ORDERED.

his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause.
*United States v. Batchelder,* 442 U.S. 114, 123–24, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *see also United States v. Mishoe,* 241 F.3d 214, 220 (2d Cir.2001) ("Although Congress has made a mandatory life sentence *available* for any seller of 50 or more grams of crack who has two prior felony narcotics convictions, it has done so in contemplation of both a criminal justice system that appropriately accords substantial discretion to prosecutors in determining what charges to initiate and what plea agreements to accept, and the limited discretion of sentencing judges to ameliorate unduly harsh punishments." (emphasis in original)); *cf. Lovely,* 175 F.2d at 317–18 ("The sentence imposed upon accused is undoubtedly severe—perhaps too severe. Congress in enacting [new legislation] has indicated its conviction that a sentence of life imprisonment might be too harsh a penalty.... The District Judge, however, felt that he had no discretion to impose a lesser punishment under the law governing accused's sentence. Any mitigation of the sentence in line with the present views of Congress must now be sought at the hands of the Executive where such discretion is lodged.").